**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| FAREED NASSOR HAYAT | * | |
| | * | |
| Plaintiff | * | |
| | * | |
| v. | * | Civil Action No. 8:20-cv-02994-LKG |
| | * | |
| SGT. CASEY DIAZ, ET AL. | * | |
| | * | |
| Defendants | * | |

**<u>TABLE OF CONTENTS FOR MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT</u>**

I.     INTRODUCTION ........................................................................................................1

II.    STATEMENT OF UNDISPUTED MATERIAL FACTS ............................................3

III.   STANDARD OF REVIEW ........................................................................................12

IV.   LEGAL ARGUMENT................................................................................................14

     A.  Summary Judgment Should Be Granted As To Count IV, Violation Of
        Fourth Amendment Rights - 42 U.S.C. § 1983 ........................................................14

        1.  Entry and Seizure........................................................................................14

            a.  Officers' Entry into The Home and Seizure Was Constitutional
               Because Officers Had Reasonable Articulable Suspicion to Seize
               Plaintiff or an Investigatory Stop Prior to Plaintiff Retreating into
               the Home........................................................................................14

            b.  The Imminent Threat of Harm Posed to the Children Justified Entry
               into the Residence and Seizure to Locate and Check the Welfare
               of the Children. ..............................................................................19

            c.  Alternatively, Defendants are Entitled to Qualified Immunity with
               Respect to Count IV, Entry and Seizure ........................................20

            d.  Qualified Immunity Applies to Officers Who Act in Reasonable
               Reliance on Information Provided By Other Officers. ...............................23

i

2.  Use of Force..................................................................................26

    a.  The Use of Force Was Constitutional Because It Was Objectively
       Reasonable and Was Not Excessive**.** ........................................26

    b.  Alternatively, Defendants Are Entitled to Qualified Immunity With
       Respect To Count IV, Use Of Force. ..........................................28

B.  Summary Judgment Should be Granted As to Count V, Violation of MD.
    Decl. of Rights Articles 24 and 26 ..........................................................30

C.  Summary Judgment Should Be Granted As To All Counts Against Does 1-10 .....30

D.  Summary Judgment Should Be Granted As To Punitive Damages........................31

E.  Summary Judgment Should Be Granted In Favor Of Chief Jones ..........................33

F.  If The Court Finds That Entry Into The Residence Was Constitutional, Then The
    *Monell* Claim Under Count IV Is Necessarily Extinguished And Judgment Should Be
    Entered In Favor Of Chief Jones And The County under Count IV .......................36

G.  If The Court Enters Summary Judgment Under Count V Against Sgt. Diaz, Ofc. Min,
    Ofc. Dolan, And Ofc. Lenhart, Then Judgment Should Be Entered In Favor Of The
    County As To Count V ..........................................................................36

V.  CONCLUSION...............................................................................36

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

FAREED NASSOR HAYAT      \*
     \*
       Plaintiff      \*
     \*
     v.      \*      Civil Action No. 8:20-cv-02994-LKG
     \*
SGT. CASEY DIAZ, ET AL.      \*
     \*
       Defendants      \*

**LIST OF EXHIBITS**

1. Emergency Communications Center Radio Transmission

2. Excerpts of Incident Report and CAD Report

3. Deposition Transcript of Ofc. Jorge Moran

4. Affidavit of Cassandra Onley

5. Affidavit of Sgt. Casey Diaz

6. Deposition Transcript of Sgt. Casey Diaz

7. Sgt. Casey Diaz's Body Worn Camera Footage

8. Affidavit of Ofc. Nicole Min

9. Ofc. Nathan Lenhart's Body Worn Camera Footage

10. Deposition Transcript of Ofc. Nicole Min

11. Deposition Transcript of Ofc. Nathan Lenhart

12. Affidavit of Ofc. Nathan Lenhart

13. Affidavit of Ofc. Brooke Dolan Kyriacou

14. Ofc. Nathan Lenhart's Body Worn Camera Footage, Part II

15. Body Worn Camera Footage 1700769290_1_Eastmoor_Drive

16. Sgt. Diaz Body Worn Camera Footage, Part II

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| FAREED NASSOR HAYAT | * | |
| | * | |
| Plaintiff | * | |
| | * | |
| v. | * | Civil Action No. 8:20-cv-02994-LKG |
| | * | |
| SGT. CASEY DIAZ, ET AL. | * | |
| | * | |
| Defendants | * | |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT**

**COME NOW** Defendants, Sgt. Casey Diaz, Officer Nicole Min, Officer Brooke Dolan, Officer Nathan Lenhart, Chief Marcus Jones, and Montgomery County, Maryland, and submit this Memorandum of Law in support of their Motion for Summary Judgment and state the following in support thereof:

## I.   INTRODUCTION

Plaintiff filed the instant lawsuit against Sgt. Casey Diaz, Officer Nicole Min, Officer Brooke Dolan, Officer Nathan Lenhart, Chief Marcus Jones, Montgomery County, Maryland, and Does 1-10, arising out of Montgomery County Police Department's ("MCPD") priority response to a 911 call received on October 22, 2017, reporting a kidnapping of children outside of an IHOP restaurant.

Following Defendants' Partial Motion to Dismiss the Amended Complaint (ECF No. 32), the Court entered an Order dismissing: (a) Counts I (Battery), II (Trespass), III (False Imprisonment), VI (Violation of 14th Amendment Right to Familial Privacy) and VII (Violation of Property Rights) in their entirety; (b) any 14th Amendment claim raised in Count IV; (c) All official capacity claims with respect to Sgt. Diaz, Ofc. Dolan, Ofc. Min, and Ofc. Lenhart; and (d)

1

Claims for monetary relief of any kind in their official capacities against Sgt. Diaz, Ofc. Dolan, Ofc. Min, Ofc. Lenhart, and Chief Marcus Jones, and the County. *See* ECF No. 35. The claims which remain are: (a) Count IV, Violation of Fourth Amendment Rights - 42 U.S.C. § 1983, against Sgt. Diaz (individual capacity), Ofc. Dolan (individual capacity), Ofc. Min (individual capacity), Ofc. Lenhart (individual capacity), Chief Jones (official capacity), Montgomery County, and Does 1-10; and (b) Count V, Violation of MD. Decl. of Rights Articles 24 and 26, against Sgt. Diaz (individual capacity), Ofc. Min (individual capacity), Ofc. Dolan (individual capacity), Ofc. Lenhart (individual capacity), Montgomery County, and Does 1-10. *Id*. The Court bifurcated Plaintiff's *Monell* Claim against the County and Chief Jones in Count IV of the Amended Complaint for discovery and trial. ECF No. 51.

Discovery on the non-bifurcated claims has been completed. There is no material dispute of fact and all Defendants now move for summary judgment as a matter of law as to the counts which remain in the Amended Complaint: (a) Count IV, Violation of Fourth Amendment Rights - 42 U.S.C. § 1983, against Sgt. Diaz, Ofc. Min, Ofc. Dolan, and Ofc. Lenhart, alleging unconstitutional entry into the residence and unconstitutional use of force; (b) Count V, Violation of MD. Decl. of Rights Articles 24 and 26, against Sgt. Diaz, Ofc. Min, Ofc. Dolan and Ofc. Lenhart, alleging unconstitutional entry into the residence and unconstitutional use of force; (c) All claims for punitive damages against Sgt. Diaz, Ofc. Min, Ofc Dolan and Ofc. Lenhart; (d) All claims against Does 1-10, to the extent the Court has jurisdiction over unidentified Does 1-10 (Counts IV and V); and (e) The official capacity claim against Chief Marcus Jones (Count IV). To the extent judgment is granted in favor of Sgt. Diaz, Ofc. Min, Ofc. Dolan, and Ofc. Lenhart on Count IV, finding that there was no constitutional violation as to entry of the residence, then judgment must also be entered as to the County and Chief Jones on Count IV. To the extent

2

judgment is granted in favor of Sgt. Diaz, Ofc. Min, Ofc. Dolan, and Ofc. Lenhart on Count V, then judgment must also be entered as to the County on Count V.

## II.     STATEMENT OF UNDISPUTED MATERIAL FACTS

On October 22, 2017, at 8:09 p.m., the Emergency Communications Center ("ECC") issued a priority call over the radio to MCPD Officers for the kidnapping of children outside of an IHOP in Silver Spring, Maryland. *See* Defendants' Ex. 1, Emergency Communications Center Radio Transmission; *see also* Defendants' Ex. 2, Excerpts of Incident Report and CAD Report, MC008. The ECC dispatcher advised officers to "respond priority for a kidnapping" in the area of Piney Branch Road and University Blvd. *See* Defendants' Ex. 1, 00:00:18-28. ECC advised that the "Complainant was told by another driver that he saw someone grab three children and put them in the trunk of a vehicle." *Id.* at 00:00:29-36. ECC then provided a description of the vehicle of the suspect, stating "A suspect vehicle, black, [license plate number], driven by a black male, northbound university towards Wheaton, unknown location in route." *Id.* at 00:01:19-32. Sgt. Robert Sheehan reported over air that "The car comes back to a 2013 Tesla, to a black male, 1 Eastmoor Drive in Silver Spring." *Id.* at 00:02:03-10. No other information was provided regarding the owner of the vehicle. *Id.* Ofc. Moran stated over air: "Teslas have rear-facing seats in the trunk, so they might be able to sit there." *Id.* at 00:02:40-47.

The kidnapping information provided to 911 came from a second party caller who identified himself as "Luis," and said that he was relaying information from the original complainant, later identified as Edgar Ayala Solano. *See* Defendants' Ex. 2, MC 005-007. Shortly after the initiation of the call, Ofc. Moran advised that he had made in-person contact with the original complainant, Edgar Ayala Solano. *Id.* at MC 005.[1] Ofc. Moran reported: "I have the

---

[1] Luis followed a White Range Rover, which he appeared to believe was the suspect vehicle. *See* Defendants' Ex. 1, 00:02:25 – 00:02:37, 00:04:58 – 00:05:02. MCPD stopped the White Range Rover and determined it was not the

original complainant here. He says that he was at the IHOP in Langley Park, that he saw the black male open the trunk, yell at the kids, and close the trunk, but like I said, they might have possible rear-facing seats in the trunk that are legal." *See* Defendants' Ex. 1, 00:04:28-50. Mr. Ayala Solano also told Ofc. Moran that he observed the suspect "tie up the children." *See* Defendants' Ex. 3, Deposition Transcript of Ofc. Jorge Moran, 12:18.

In Montgomery County, kidnapping reports are rarely made to the 911 Center. *See* Defendants' Ex. 4, Affidavit of Cassandra Onley. When emergency calls pertain to a reported kidnapping, they implicate a serious and imminent threat of harm to a victim and require immediate response to increase the likelihood of a successful rescue. *Id.* As such, MCPD responds to emergency calls of this nature as "priority," to provide the immediate and urgent police attention a potential kidnapping situation requires. *Id.*

In response to the 911 call received in the subject case, MCPD officers were dispatched priority to 1 Eastmoor Drive, Silver Spring ("the residence"). This address was associated with the registered owner of the vehicle that the 911 based on the license plate number recorded by Mr. Ayala Solano who had seen three children put into the trunk of the vehicle. *See* Defendants' Ex. 1. In response to the priority call for the kidnapping of the children, Sgt. Diaz arrived first on scene at the residence. *See* Defendants' Ex. 5, Affidavit of Sgt. Casey Diaz. At that time, Sgt. Diaz had 12 years of experience, and in addition to serving as a patrol officer, he had served on the Special Assignment Team in a plainclothes investigative unit and on the Special Investigations Division, specializing in drug trafficking. *Id.* Sgt. Diaz had received specialized training in conducting interviews and interrogations, including the signs of deception, and had conducted over 200 interviews as a patrol officer and in the special assignments. *Id.*

---

suspect vehicle. *Id.* Almost simultaneous to this stop, Officer Moran spoke directly to the original complainant and verified the key details of the kidnapping. *See* Defendants' Ex. 1, 00:04:30 – 00:05:06; Defendants' Ex. 2, MC 027.

4

Sgt. Diaz responded lights and sirens to the priority kidnapping call, but turned off the lights and sirens before he approached the residence to avoid alerting the subjects of the police presence. *Id*. After Sgt. Diaz parked his police cruiser, he began to walk up the driveway of the residence and immediately observed an unknown black male and female, later identified as Fareed Hayat (Plaintiff), and his then wife, Norrinda Hayat, already standing on the steps outside of the residence. *Id.* The male subject matched the limited description of the subject provided by the caller. *Id.* Sgt. Diaz observed that these individuals did not appear surprised by the officer's arrival, and instead, appeared to have anticipated his arrival on scene. *Id.* Based on his knowledge, training, and experience, and given that the residents of the household had not themselves requested police assistance, Sgt. Diaz found it suspicious that the individuals were standing outside of the residence, not engaging in any other activity, apparently anticipating the police arrival. *Id.* Sgt. Diaz found this especially suspicious since he did not announce his arrival with lights and sirens. *Id.* This suspicious behavior further suggested to Sgt. Diaz that the individuals may have knowledge regarding the reported kidnapping and/or that they were attempting to conceal activity within the household. *Id.*; *see also* Defendants' Ex. 6, Deposition Transcript of Sgt. Casey Diaz, 142:18-20.

Sgt. Diaz approached the Hayats and the following dialogue ensued (Defendants' Ex. 7, Sgt. Casey Diaz's Body Worn Camera Footage, 00:00:38 – 00:01:47 (T00:19:27Z-T00:20:37Z[2]):

**Sgt. Diaz:** "Hi, how are you doing? Everything okay here?"

**Plaintiff:** [indiscernible]

**Sgt. Diaz:** "Were you guys just at the IHOP down in Langley Park?"

**Plaintiff:** "What's the problem?"

**Sgt. Diaz:** "We got a call of a kidnapping, or something like that, were you guys down at the IHOP?"

---

[2] Timestamps with "Z" indicate UTC time on body worn camera footage.

**Plaintiff:** "There is no kidnapping here, sir."

**Sgt. Diaz:** "What?"

**Plaintiff**: "There is no kidnapping here, sir."

**Sgt. Diaz:** "Okay, well I just need to make sure everybody is ok."

**Plaintiff:** "Okay…how are you going to do that?"

**Sgt. Diaz:** "Well, we are talking. We are talking."

**Plaintiff:** "Everything is ok here."

**Sgt. Diaz:** "Well, I need to check. Are there any kids here?"

**Plaintiff:** "Yes."

**Sgt. Diaz:** "Well, can we see them?"

**Plaintiff:** "You cannot come into our house. We are both lawyers. I am a professor at the University of Howard, she is a professor at UDC. This is our home. You do not have a warrant. You are not coming in our home."

[Overheard in the background] **Mrs. Hayat**: "I am a professor of law."

**Sgt. Diaz:** "Can you come down here for a second?"

**Plaintiff:** "I cannot."

**Mrs. Hayat:** "Can you explain to us what is going on here?"

**Sgt. Diaz:** "Yeah, somebody saw something involving some kids at an IHOP . . . "

Mr. Hayat then abruptly cut off the conversation between Sgt. Diaz and Mrs. Hayat, putting his arm on Mrs. Hayat and ushering her back into the home, shutting the door, while saying, "Norrinda, walk into our home please. Walk into our home. If you would like to come into our home without a warrant. . ." *See* Defendants' Ex. 7.

Based on Sgt. Diaz's knowledge, training, and experience, he found it suspicious that Plaintiff stopped Mrs. Hayat from speaking about the incident and ushered her back inside. *See*

6

Defendants' Ex. 5; *see also* Defendants' Ex. 6, 146:3-9. Sgt. Diaz believed that the female subject could have had information as to what occurred at the IHOP or as to the welfare of the children. *See* Defendants' Ex. 5; *see also* Ex. 6,146:3-9.

Furthermore, based on Sgt. Diaz's knowledge, training, and experience, Sgt. Diaz believed that Plaintiff's responses were evasive and showed signs of deception because Plaintiff never acknowledged whether or not he had been at the IHOP. *See* Defendants' Ex. 5. After Sgt. Diaz told Plaintiff that he was investigating a reported kidnapping at the IHOP, Plaintiff did not act surprised or deny that he had been at the IHOP, but instead avoided the question, answering, "there is no kidnapping here." *Id.* In Sgt. Diaz's knowledge, training and experience, Plaintiff was using his background as a law professor as a deflection to Sgt. Diaz's questions. *Id.* Sgt. Diaz further found it suspicious that not only did Plaintiff prevent Mrs. Hayat from sharing information she may have had about the children's welfare, but Plaintiff seemed particularly concerned about her learning details of the kidnapping report that Sgt. Diaz was trying to share with Mrs. Hayat. *Id.* Sgt. Diaz believed that Plaintiff's demeanor was defensive and evasive throughout the encounter, given Plaintiff's posture, body language and tone of voice. *Id.*

Furthermore, while Sgt. Diaz had only asked to see the children to verify their welfare, Plaintiff became even more defensive, stating that he and Mrs. Hayat were attorneys. *Id.* Despite the fact that Sgt. Diaz had not asked nor attempted to enter the residence, Mr. Hayat told Sgt. Diaz that he could not enter the home. *Id.* Sgt. Diaz's suspicions continued to be raised when Plaintiff became even more agitated when Mrs. Hayat asked Sgt. Diaz to explain what was going on. *Id.* As Sgt. Diaz began to provide this information to Mrs. Hayat, Plaintiff abruptly ushered Mrs. Hayat back into the residence and ended the communication. *Id.* This prevented Sgt. Diaz from

informing Mrs. Hayat with details about the reported kidnapping and prevented Mrs. Hayat from sharing information she may have had that was relevant to this critical, ongoing investigation. *Id.*

Based on Sgt. Diaz's knowledge, training, and experience, the information he received regarding the reported kidnapping, Plaintiff's comments and behavior, the totality of these observations and the information known to Sgt. Diaz at that time, which included the ECC transmissions, Sgt. Diaz believed that children were inside of the residence who were in immediate threat of serious danger. *See* Defendants' Ex. 5. As such, when Plaintiff suddenly attempted to end the investigation and close Sgt. Diaz out from the home with the children inside, Sgt. Diaz attempted to prevent Plaintiff from shutting the door. *See* Defendants' Ex. 5. Ofc. Min, who had approached later in time[3], assisted Sgt. Diaz with the door, while both officers commanded Plaintiff to "open the door", to which Plaintiff physically resisted, pushing back against the door, while yelling back, "you are not allowed in our house." *See* Defendants' Ex. 7, 00:01:41-00:01:47 (T00:20:30Z-T00:20:36Z).

Despite Plaintiff's non-compliance and efforts to physically keep the officers outside, Sgt. Diaz and Ofc. Min eventually succeeded in gaining entry, wherein they were confronted with a belligerent Plaintiff in the immediate, confined foyer. *See* Defendants' Ex. 9, Ofc. Nathan Lenhart's Body Worn Camera Footage, 00:00:00 – 00:00:20 (T00:20:44Z- 21:05Z). From the moment of entry, Plaintiff yelled at the police repeatedly, screaming that he was an attorney and that they could not be in his home. *See generally* Defendants' Ex. 9. MCPD gave commands to Plaintiff in an effort to handcuff him so that they could safely investigate and verify the welfare of

---

[3] Ofc. Min approached the scene when Plaintiff and Sgt. Diaz were already speaking outside, and therefore she did not hear the entire conversation. Ex. 8, Affidavit of Ofc. Nicole Min. At the time, Ofc. Min had served as a patrol officer and was Crisis Intervention Team certified. *Id.*

the children.[4] However, Plaintiff continued to scream and resisted the officers' efforts to gain control of his arms and handcuff him. *See* Defendants' Ex. 10, Deposition Transcript of Ofc. Nicole Min, 77:1-2; Defendants' Ex. 9. Since Plaintiff was resisting efforts to handcuff him and Plaintiff was taller than Sgt. Diaz and Ofc. Min, commands were given to Plaintiff to "get on the ground" so that he could be safely and effectively placed in handcuffs. *See* Defendants' Ex. 10, 78:13 – 79:4.

Ofc. Lenhart, who arrived on scene after the entry by Sgt. Diaz and Officer Min, heard a loud commotion from the driveway, which prompted him to run up to the residence. *See* Defendants' Ex. 11, Deposition Transcript of Ofc. Nathan Lenhart, 46:19-47:1; *see also* Defendants' Ex. 12, Affidavit of Ofc. Nathan Lenhart. Ofc. Lenhart knew that the police were responding to a reported kidnapping and heard officers stating, "put your hands behind your back" and "get on the ground" to a male subject who was actively resisting and refusing to comply with the officers' orders. *See* Defendants' Ex. 11, 47:2-9, 56:8-20; *see also* Defendants' Ex. 12. Ofc. Lenhart observed that Ofc. Min and Sgt. Diaz were both smaller than Plaintiff, and that Ofc. Min and Sgt. Diaz were unable to gain Plaintiff's compliance with their orders for him to place his hands behind his back. *See* Defendants' Ex. 12; *see also* Defendants' Ex. 9, 00:00:00 – 00:00:20 (T00:20:44Z- 21:05Z). Ofc. Lenhart observed that Plaintiff was not giving up his hands to be handcuffed, and was not placing his hands behind his back or getting on the ground as ordered.[5] *See* Defendants' Ex. 12; *see also* Defendants' Ex. 9, 00:00:00 – 00:00:20 (T00:20:44Z- 21:05Z).

---

[4] Given Plaintiff's highly agitated state, Plaintiff was being handcuffed to keep everyone safe while officers conducted their investigation. *See* Defendants' Ex. 10, 71:9 – 72:16.

[5] Ofc. Lenhart, who has served as a patrol officer, a field training officer, and is Crisis Intervention Team certified, has experience, knowledge, and training in utilizing control techniques to restrain an individual, while minimizing the potential for injury to both the subject and the officer. *See* Defendants' Ex. 12. In Ofc. Lenhart's knowledge, training, and experience, he learned that it is safer for both the subject and the officer to handcuff a noncompliant subject on the ground when the person is resisting because it is easier to gain control and minimizes the likelihood of needing to use higher levels of force. *Id.*

9

Therefore, given Plaintiff's non-compliance and active resistance, Sgt. Diaz, Ofc. Min, and Ofc. Lenhart brought Plaintiff to the ground from a standing position to place him in handcuffs. *See* Defendants' Ex.  10, 83:18 – 84, Defendants' Ex. 12. Ofc. Lenhart employed control techniques from his knowledge, training, and experience as an officer, to physically restrain Plaintiff, while minimizing the potential for injury to both Plaintiff and officers. *See* Defendants' Ex. 12. Ofc. Lenhart grabbed Plaintiff from his upper torso, guided him to the ground, and in the prone position on the ground, maintained control of his upper arms to attempt to handcuff him. *See* Defendants' Ex. 11, 58:6-8, 61:1-7; *see also* Defendants' Ex. 12.  During this time, Plaintiff repeatedly screamed "you cannot do this in our home" (Ex. 9, 00:00:15-26, T:00:21:00Z) and "we are both law professors," (*Id.* at 00:00:26-32, T00:21:11Z-T00:21:17Z). Sgt. Diaz repeatedly and calmly told Plaintiff, "Put your hands behind your back," given Plaintiff's continued non-compliance with this command. *Id.* at 00:00:27-35 (T00:21:12Z-T00:21:20Z). No strikes, hits, punches, kicks, or weapons were used against Plaintiff. *See* Defendants' Exs. 5, 8, 12, and 13 (Affidavit of Ofc. Brooke Dolan Kyriacou).

During this period of time, Mrs. Hayat also repeatedly screamed, while Ofc. Min continuously and calmy instructed Mrs. Hayat to "calm down," so that she could speak with Mrs. Hayat to the side. *See* Defendants' Ex. 9, 00:00:45-00:01:00 (T00:21:30Z-T00:21:45Z). Mrs. Hayat attempted to speak with officers, while Plaintiff screamed at her to stop speaking with them. *See* Defendants' Ex. 14, Ofc. Nathan Lenhart's Body Worn Camera Footage, Part II, 00:00:01-25 (T00:21:46Z-T00:22:11Z). Plaintiff continued to yell at the officers and Mrs. Hayat, and Sgt. Diaz again told Plaintiff to calm down and to relax, and Plaintiff screamed that he was not calm and that he was highly upset. *Id.* at 00:00:47 – 00:01:30 (T00:22:34Z-T00:23:16Z).

Soon after Plaintiff was handcuffed, he was taken to a kneeling position on the floor, with Sgt. Diaz and Ofc. Lenhart next to him and with hands on him. *See* Defendants' Ex. 15, Body Worn Camera Footage 1700769290_1_Eastmoor_Drive, starting at 00:01:22 (T00:23:04Z). Sgt. Diaz then joined Ofc. Min and Ofc. Dolan, who were speaking with Mrs. Hayat. *Id.* at 00:01:49 (T:0023:31Z). Ofc. Lenhart then cleared a spot on the bench in the foyer and calmly said to Plaintiff, "Sir, why don't you have a seat right here." *See* Defendants' Ex. 14, 00:02:39 (T:00:24:24Z). At this point, no officer was touching Plaintiff, and the officers were speaking with Plaintiff. *Id.* Once Plaintiff appeared calmer, he was unhandcuffed. *See* Defendants' Ex. 15, 00:09:37 (T:00:31:19Z).

Plaintiff requested an ambulance so that he could document the condition of his mouth. *Id.* at 00:12:16 (T:00:33:57Z). EMS arrived and examined Plaintiff. *Id.* at 00:20:52 (T:00:42:34Z). Minimal redness was observed in the inner part of Plaintiff's lip. *Id.* at 00:21:00 (T00:42:41Z). Plaintiff declined any medical treatment saying, "I don't believe I need to go to the hospital." *Id.* at 00:21:27 (T00:43:09). There is no evidence in the record of any bruising, abrasions, or injury for which Plaintiff sought treatment.

Ofc. Dolan approached the scene later in time, when Plaintiff and Sgt. Diaz were already speaking outside near the front door, and therefore she did not hear the entire conversation, nor did she speak with Plaintiff. Defendants' Ex. 13. Ofc. Dolan entered the home after Sgt. Diaz and Ofc. Min entered the home. *Id.* Ofc. Dolan did not at any time touch or speak with Plaintiff. *Id.*

Initially, Mrs. Hayat refused to cooperate with the officers to allow them to verify the welfare of the children. *See* Ex. 16, Sgt. Diaz Body Worn Camera Footage Part II, 00:03:00-00:03:10 (T00:27:05Z-T00:27:15Z). However, Plaintiff's brother, an individual not involved with the incident, later arrived at the home, and independently told Sgt. Diaz that Plaintiff and his wife

11

have three kids. *Id.* at 00:01:30-00:02:09 (T00:25:34Z-T00:26:13Z). Plaintiff's brother provided the children's names, and he confirmed that he had just seen one of the kids inside the home. *Id.* Thereafter, Mrs. Hayat did finally share the kids' whereabouts for the day and she confirmed that Plaintiff and her children had indeed been at the IHOP. *Id.* at 00:02:55-00:05:10 (T00:27:00Z-T00:29:15). Mrs. Hayat also showed Ofc. Dolan the children. *Id.* at 00:04:51 (T00:28:56Z). An officer indicated that he had been allowed to briefly observe the children and that they appeared okay. *Id.* at 00:02:58 (T00:27:03Z). After the investigation was conducted and MCPD determined that a kidnapping had not occurred, the officers left the scene. *See* Defendants' Ex. 5.

## III.    STANDARD OF REVIEW

Summary judgment should be granted if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). This provision has been described as "an integral part" of the Federal Rules and is "designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986). The moving party has the "initial responsibility of informing the district court of the basis for its motion" and then identifying those portions of the record "which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323.  The burden then shifts to the non-moving party to "'set forth specific facts showing that there is a genuine issue for trial.'" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (quoting *First National Bank of Arizona* v. *Cities Service Co.*, 391 U.S. 253 (1968)).

The non-movant cannot rest upon unsupported allegations in his pleadings or elsewhere but must show "'significant probative evidence'" to support those allegations. *Anderson* 477 U.S. at 256 (quoting *First Nat'l Bank*, 391 U.S. at 290). Moreover, a "'mere scintilla of evidence is not enough to create a fact issue; there must be evidence on which a jury might rely.'" *Barrick v.*

12

*Celotex*, 736 F.2d 946, 958-59 (4th Cir. 1984) (quoting *Seago v. N.C. Theatres, Inc.*, 42 F.R.D. 627, 640 (E.D.N.C. 1967)). If the non-movant fails to do so, the Court has "an affirmative obligation ... to prevent 'factually unsupported claims...' from proceeding to trial." *Felty v. Graves Humphrey Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987) (quoting *Celotex Corp., supra*). "Summary judgment is 'the principal tool by which factually insufficient claims or defenses [can] be isolated and prevented from going to trial with the attendant unwarranted consumption of public and private resources.'" *Williams v. Garrett,* No. CIV. A. HAR 91-106, 1993 WL 524768, at *2 (D. Md. Dec. 7, 1993) (quoting *Celotex*, 477 U.S. at 327).

"At the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007). "[W]hen the moving party has carried its burden[,] . . . its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Id.* (quoting *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–587 (1986)). "'[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact.'" *Scott,* 550 U.S. at 380 (citing *Anderson*, 477 U.S. at 247–248). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott,* 550 U.S. at 380. "Trial is unnecessary if 'the facts are undisputed, or if disputed, the dispute is of no consequence to the dispositive question.'" *Green v. Duke Energy Corp.*, No. 1:03CV264, 2004 WL 727036, at *3 (M.D.N.C. Mar. 30, 2004), *aff'd*, 111 F. App'x 688 (4th Cir. 2004).

13

## IV.   LEGAL ARGUMENT

### A. <u>Summary Judgment Should Be Granted As To Count IV, Violation Of Fourth Amendment Rights - 42 U.S.C. § 1983</u>

#### 1.   Entry and Seizure

##### a.   Officers' Entry into The Home and Seizure Was Constitutional Because Officers Had Reasonable Articulable Suspicion to Seize Plaintiff for an Investigatory Stop Prior to Plaintiff Retreating into the Home.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons . . . against unreasonable . . . seizures." U.S. Const. amend. IV. This guarantee, however, "does not extend to all police-citizen encounters." *United States v. Lewis*, No. 4:17-CR-887-RBH, 2018 WL 827286, at *3 (D.S.C. Feb. 12, 2018), *aff'd*, 797 F. App'x 744 (4th Cir. 2019) (citing *United States v. Jones*, 678 F.3d 293, 298-99 (4th Cir. 2012)). In *California v. Hodari D.*, 499 U.S. 621, 626 (1991), the Supreme Court held that a seizure requires either physical force to restrain movement or, where that is absent, submission by the subject to the assertion of authority by the police officer. *Id*. The Fourth Circuit recently reiterated the holding of *United States v. Mendenhall*, 446 U.S. 544, 554 (1980), that an officer's show of authority occurs when an individual would not feel free to leave, and that the individual's view should be measured objectively from an innocent person's perspective. *United States v. Cloud*, 994 F.3d 233, 242 (4th Cir. 2021). But there is more to the inquiry than just whether an officer displayed a show of authority, which the Fourth Circuit stated is necessary, although not alone sufficient, to implicate the Fourth Amendment. *Id.* Seizure requires submission "to that show of authority." *Id.* And, critically, "without actual submission to the police, there is at most an attempted seizure, which is not subject to Fourth Amendment protection." *Cloud*, 994 F.3d at 242 (citations and internal quotations omitted).

When Sgt. Diaz arrived at Plaintiff's home, he did not have his lights and sirens activated. When Sgt. Diaz spoke with Plaintiff outside of the home, Sgt. Diaz did not have his service weapon drawn. Rather, Sgt. Diaz initially engaged in a consensual encounter. Sgt. Diaz alone approached Plaintiff, who was already standing outside of the residence, and greeted Plaintiff with a calm, casual tone. At that time, Sgt. Diaz simply began a conversation with Plaintiff.  He did not apply any force to seize Plaintiff or tell Plaintiff that he was not free to leave. In sum, up until the point where Plaintiff attempted to shut the police out of the residence and officers ordered Plaintiff to "open the door" and attempted to prevent the door from being shut, the interaction between Sgt. Diaz and Plaintiff was a consensual encounter operating outside of the Fourth Amendment. *Florida v. Bostick*, 501 U.S. 429, 434-35 (1991).

Although the encounter was consensual up until the point where Plaintiff attempted to shut the police out of the house, MCPD had reasonable articulable suspicion of criminal activity and had the authority to detain Plaintiff pursuant to a *Terry* Stop (investigative detention), as set forth in *Terry v. Ohio*, 392 U.S. 1 (1968). This reasonable articulable suspicion was based on the information obtained by MCPD prior to Sgt. Diaz's arrival at 1 Eastmoor Drive, and through Sgt. Diaz's investigation and observations at the residence. To detain an individual pursuant to a *Terry* stop, an officer must have reasonable articulable suspicion of criminal activity. *United States v. Johnson*, 599 F.3d 339, 345 (4th Cir. 2010). Reasonable suspicion is suspicion based on "specific and articulable facts . . . taken together with rational inferences from those facts[.]" *Terry*, 392 at 21. This is an objective standard that examines the reasonableness of police action based on the facts available to the officer at the time of the seizure. *Id.* at 21-22. "The Fourth Amendment requires 'some minimal level of objective justification' for making the stop." *United States v. Sokolow*, 490 U.S. 1, 7 (1989). "That level of suspicion is considerably less than proof of

15

wrongdoing by a preponderance of the evidence." *Id.* "[T]he level of suspicion required for a *Terry* stop is obviously less demanding than that for probable cause[.]" *Id.* Furthermore, "[p]olice officers routinely rely on information from other officers, and reliance—absent clear, contradictory evidence—is reasonable." *Rose v. Centra Health, Inc.*, No. 6:17-CV-00012, 2017 WL 3392494, at *4 (W.D. Va. Aug. 7, 2017) (citing *Whiteley v. Warden, Wyo. State Penitentiary*, 401 U.S. 560, 568 (1971)).

Importantly, once the Court has "determined the relevant set of facts and drawn all inferences in favor of the nonmoving party to the extent supportable by the record", the "objective reasonableness of officers' conduct is a matter of law to be decided by the court." *Armstrong v. Hutcheson*, 80 F.4th 508, 513 (4th Cir. 2023). Given the facts here, an objectively reasonable police officer would have believed that there was reasonable articulable suspicion of criminal activity. Officers were dispatched for a priority kidnapping call that three children were grabbed by a yelling man and put into the trunk of a vehicle. The reported incident was so concerning, that it prompted an independent witness, Edgar Ayala Solano, to take steps to notify 911. *See also* Defendants' Ex. 6, 182: 3-7. Mr. Ayala Solano provided an accurate description of the vehicle and tag number, and reported it was being driven by a black male. Ofc. Moran spoke directly with Mr. Ayala Solano, who witnessed the event, and Mr. Ayala Solano confirmed to Ofc. Moran that he suspected a kidnapping when he saw the black male open the trunk, tie up children inside, yell at them, and slam the trunk and drive off.  Defendants' Ex. 3, 12:1-20. A license plate check came back to a registered Tesla[6] with an associated address of 1 Eastmoor Drive and the limited description of the associated owner as a black male.

---

[6] In 2013, Tesla made one model vehicle, the "Model S", which had an option for rear-facing child seats, but this was not standard. EVSpecifications, www.evspecifications.com/en/brand/b1e92. At the residence, the Tesla was not

When Sgt. Diaz arrived at the residence without lights and sirens, Plaintiff and Mrs. Hayat were already waiting on the front step of their residence, not visibly engaged in any activity, and seemingly anticipating the arrival of police. Plaintiff stood in front of the door and matched the limited description provided in the initial lookout. When Sgt. Diaz notified Plaintiff that he was investigating a reported kidnapping outside of the IHOP in Langley Park and asked Plaintiff whether he had been at the IHOP, Plaintiff did not appear surprised or acknowledge whether or not he had been at the IHOP. Plaintiff instead evaded the question and appeared defensive, and only responded, "There is no kidnapping here." Plaintiff choose to use his career background as a deflection to Sgt. Diaz's questions. Plaintiff confirmed that there were children located inside of the home, and while Sgt. Diaz never asked to enter the home to see the children, Plaintiff defensively and adamantly said that the officer could not enter the home. Mrs. Hayat began to engage in a dialogue with Sgt. Diaz, asking the police officer for more information about the reported kidnapping, but Plaintiff cut her off and ushered her back into the residence before Sgt. Diaz could answer her question about the reported kidnapping. It appeared to Sgt. Diaz that Plaintiff was attempting to prevent Sgt. Diaz and Mrs. Hayat from exchanging information that may be relevant to the kidnapping investigation. Sgt. Diaz, who has had experience, knowledge, and training in recognizing signs of deception, reasonably believed that Plaintiff was showing signs of deception, as set forth above.[7]  Furthermore, Sgt. Diaz was not able to confirm the welfare of the children. The totality of these observations, in addition to the ECC communications, viewed

---

visible for MCPD to perform a visual scan to determine whether this particular model had rear-facing seats in the trunk. Furthermore, children can be kidnapped regardless of where they are placed in a vehicle.

[7] Evasive behavior may be considered in forming reasonable articulable suspicion. *See District of Columbia v. Wesby*, 583 U.S. 48, 59-60 (2018); *United States v. Diboh*, No. 5:17-CR-176-FL, 2018 WL 4701839, at *7 (E.D.N.C. Apr. 24, 2018), *report and recommendation adopted*, No. 5:17-CR-176-FL, 2018 WL 2560328 (E.D.N.C. June 4, 2018); *United States v. Davis*, 588 F. Supp. 2d 693, 705 (S.D. W. Va. 2008).

through the lens of Sgt. Diaz's knowledge, training and experience[8], provided Sgt. Diaz with reasonable articulable suspicion that a crime had been committed – kidnapping.

While Plaintiff retreated into his home, an individual's retreat into their home cannot thwart a *Terry* stop if officers had reasonable suspicion prior to the retreat. *See Rivera v. Washington*, 57 Fed. App'x 558, 562 (4th Cir. 2003) ("courts have recognized that a person cannot avoid a *Terry* stop simply by retreating into a home") (collecting cases); *Harbin v. Alexandria*, 712 F. Supp. 67, 71-72 (E.D. Va. 1989) (relying on *United States v. Santana*, 427 U.S. 38 (1976), the court upheld the stop of the plaintiff in his home after officers followed the plaintiff from the street and called to the plaintiff to stop as he crossed the threshold of his house and entered the living room); *Maros v. Cure*, No. 6:21-CV-03346-JD-JDA, 2024 WL 1528518, at *7 (D.S.C. Jan. 24, 2024), *report and recommendation adopted*, No. 6:21-CV-3346-JD-JDA, 2024 WL 1152738 (D.S.C. Mar. 15, 2024) ("The Court concludes, therefore, that it is not the case that a reasonable officer in [officer] Cure's position would have realized that she was precluded from subjecting a suspect to a *Terry* stop within the curtilage of his home."); *c.f. Allotey v. Baltimore Cnty., Maryland,* No. 1:21-CV-02288-JMC, 2022 WL 17105120, at *6 (D. Md. Nov. 22, 2022), *appeal dismissed sub nom. Allotey v. Becketts*, No. 22-2312, 2023 WL 4198891 (4th Cir. Jan. 11, 2023) ("However, this Court recognized that the cases establishing the impermissibility of retreat into the home to defeat a *Terry* stop involved facts where officers had reasonable suspicion to stop suspects *before* they retreated into a house.")

Here, the Officers had reasonable articulable suspicion of the crime of kidnapping before Plaintiff retreated into his home based on the alarming 911 report of children being put into the

---

[8] "The Supreme Court has recognized that this reasonable suspicion inquiry should allow officers 'to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" *United States v. Brice,* No. 317CR00122MOCDSC, 2017 WL 3710800, at *2 (W.D.N.C. Aug. 28, 2017) (quoting *U.S. v. Arvizu*, 534 U.S. 266, 273 (2002).

trunk of a vehicle by a yelling man, the fact that the reported vehicle was registered to Plaintiff's address, and Plaintiff's behavior towards police in response to Sgt. Diaz's arrival and communication. Given these facts, the officers had reasonable articulable suspicion of the reported kidnapping and were justified in following Plaintiff into the home to continue investigating the suspected kidnapping. Therefore, MCPD's entry into the home to continue the *Terry* stop was constitutionally permissible under the Fourth Amendment.

### b. The Imminent Threat of Harm Posed to the Children Justified Entry into the Residence and Seizure to Locate and Check the Welfare of the Children.

"[L]aw enforcement officers may enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury." *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006).[9] "'The need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency.'" *Brigham City*, 547 U.S. at 403 (quoting *Mincey v. Arizona*, 437 U.S. 385, 392 (1978)). Law enforcement must have "an objectively reasonable basis for believing that an occupant is seriously injured or imminently threatened with such injury." *Brigham City*, 547 U.S. at 400. Law enforcement "action is 'reasonable' under the Fourth Amendment, regardless of the individual officer's state of mind, 'as long as the circumstances, viewed *objectively*, justify [the] action.'" *Brigham City*, 437 U.S. at 404 (quoting *Scott,* 436 U.S. at 138 (1978)).

---

[9] In Maryland, this exception is referred to as the "emergency aid doctrine", which falls under the umbrella term of "community caretaking" exception. *Dehn Motor Sales, LLC v. Schultz*, 212 Md. App. 374, 390–91, 69 A.3d 61, 71 (2013), *aff'd*, 439 Md. 460, 96 A.3d 221 (2014). As of the time of this incident, it was firmly established in Maryland that the community caretaking doctrine applied to homes. *Olson v. State*, 208 Md. App. 309, 346, 56 A.3d 576, 598 (2012) (gathering cases). Moreover, Maryland has recognized that even in "mixed motive" cases, for example, in a suspected burglary, wherein police enter a residence to assist victims of the suspected burglary, but are also acting to investigate the burglary, the police's actions will still fall under the community caretaking doctrine. *Olson v. State*, 208 Md. App. 309, 341–42, 56 A.3d 576, 595–96 (2012).

19

Officers were faced with a fluid and rapidly evolving situation in response to a priority call for kidnapping of children. Time was of the essence to protect the children. Officers were actively investigating the on-going call for kidnapping based on their well-founded and objectively reasonable concern for the safety of the children. Officers had "an objectively reasonable basis for believing an occupant [was] seriously injured or imminently threatened with such injury", as the children were reportedly put into the trunk of a vehicle registered to Plaintiff's address, by a yelling man, and Plaintiff was evasive, defensive, and deceptive in his interactions with the police. There was an immediate and urgent need for officers to enter the home to determine whether the children were actually safe because once Plaintiff shut and locked the door, officers would be hindered in their ability to check on the children's welfare or render aid. Officers had to make a split-second decision of allowing the door to close and thus exposing the children to the continued harm of being kidnapped or additional injury, or to force entry, in order to prevent any further harm to the children. Officers were not willing to take this risk, with children's lives at stake, and therefore they made an objectively reasonable decision to force entry.

### c.   Alternatively, Defendants are Entitled to Qualified Immunity with Respect to Count IV, Entry and Seizure.

To the extent the Court has not already granted summary judgment for the reasons stated above, Defendants Sgt. Diaz, Ofc. Dolan, Ofc. Min, and Ofc. Lenhart are entitled to qualified immunity with respect to Count IV. "[Q]ualified immunity affords government officials greater protection than a simple defense on the merits," as "[a] police officer should prevail on an assertion of qualified immunity if a reasonable officer possessing the same information *could* have believed that his conduct was lawful." *Slattery v. Rizzo*, 939 F.2d 213, 216 (4th Cir. 1991); *see also Minor v. Prince George's Cnty., Maryland*, No. PWG-15-983, 2017 WL 633321, at *6 (D. Md. Feb. 15, 2017). As set forth in *District of Columbia v. Wesby*, 583 U.S. 48, 62-64 (2018):

20

Under our precedents, officers are entitled to qualified immunity under §1983 unless they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was "clearly established at the time." *Reichle* v. *Howards*, 566 U. S. 658, 664, 132 S. Ct. 2088, 182 L. Ed. 2d 985 (2012). "Clearly established" means that, at the time of the officer's conduct, the law was "'sufficiently clear' that every 'reasonable[10] official would understand that what he is doing'" is unlawful. *al-Kidd*, *supra,* at 741, 131 S. Ct. 2074, 179 L. Ed. 2d 1149 (quoting *Anderson* v. *Creighton*, 483 U. S. 635, 640, 107 S. Ct. 3034, 97 L. Ed. 2d 523 (1987)). In other words, existing law must have placed the constitutionality of the officer's conduct "beyond debate." *al-Kidd*, *supra*, at 741, 131 S. Ct. 2074, 179 L. Ed. 2d 1149. This demanding standard protects "all but the plainly incompetent or those who knowingly violate the law." *Malley* v. *Briggs*, 475 U. S. 335, 341, 106 S. Ct. 1092, 89 L. Ed. 2d 271 (1986).

To be clearly established, a legal principle must have a sufficiently clear foundation in then-existing precedent. The rule must be "settled law," *Hunter* v. *Bryant*, 502 U. S. 224, 228, 112 S. Ct. 534, 116 L. Ed. 2d 589 (1991) (*per curiam*), which means it is dictated by "controlling authority" or "a robust 'consensus of cases of persuasive authority,'" *al-Kidd*, *supra*, at 741-742, 131 S. Ct. 2074, 179 L. Ed. 2d 1149 (quoting *Wilson* v. *Layne*, 526 U. S. 603, 617, 119 S. Ct. 1692, 143 L. Ed. 2d 818 (1999)). It is not enough that the rule is suggested by then-existing precedent. The precedent must be clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply. *See Reichle*, 566 U. S., at 666, 132 S. Ct. 2088, 182 L. Ed. 2d 985. Otherwise, the rule is not one that "every reasonable official" would know. *Id.*, at 664, 132 S. Ct. 2088, 182 L. Ed. 2d 985 (internal quotation marks omitted).

The "clearly established" standard also requires that the legal principle clearly prohibit the officer's conduct in the particular circumstances before him. The rule's contours must be so well defined that it is "clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier* v. *Katz*, 533 U. S. 194, 202, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001). This requires a high "degree of specificity." *Mullenix* v. *Luna*, 577 U. S. 7, 13, 136 S. Ct. 305, 309, 193 L. Ed. 2d 255, 260 (2015) (*per curiam*). We have repeatedly stressed that courts must not "define clearly established law at a high level of generality, since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced." *Plumhoff*, *supra,* at 779, 134 S. Ct. 2012, 2023, 188 L. Ed. 2d 1056, 1069) (internal quotation marks and citation omitted). A rule is too general if the unlawfulness of the officer's conduct "does not follow immediately from the conclusion that [the rule] was firmly established." *Anderson*, *supra*, at 641, 107 S. Ct. 3034, 97 L. Ed. 2d 523. . . .

---

[10]"Reliance on the objective reasonableness of an official's conduct, as measured by reference to clearly established law, should avoid excessive disruption of government and permit the resolution of many insubstantial claims on summary judgment." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

21

> We have stressed that the "specificity" of the rule is "especially important in the Fourth Amendment context." *Mullenix, supra*, at 12, 136 S. Ct. 305, 308, 193 L. Ed. 2d 255, 259. . . .

Applying these principles to the facts known to the officers, as stated above in Sections II and IV(A)(1)(a)-(b), it is clear that the officers' actions were constitutional and lawful, as they had reasonable articulable suspicion to seize Plaintiff for an investigatory stop prior to Plaintiff retreating into his home, and such reasonable articulable suspicion continued after he retreated into his home because the condition of the children had not been verified. The potential imminent harm posed to the children who had been reported as kidnapped justified entry into the residence to locate and check on the welfare of the children as authorized under *Brigham*.

In the alternative, to the extent the officers lacked reasonable articulable suspicion to enter, or lacked an emergency situation contemplated under *Brigham*, the officers are entitled to qualified immunity because, at the time of the subject occurrence, it was not clearly established that it was a violation of Plaintiff's constitutional rights for the officers to enter the home without his consent, under these emergency circumstances to ensure that the reported child victims of a kidnapping were safe. It was objectively reasonable for the officers to believe that reasonable articulable suspicion did exist, and that emergency assistance was authorized. There is no Supreme Court, Fourth Circuit or Maryland Supreme Court case identifying a constitutional violation under comparable circumstances when officers sought to enter a home without consent to complete a *Terry* stop investigation and check on the safety of children who had reportedly been kidnapped. Therefore, it was not clearly established that the officers' entry into the home and seizure of Plaintiff would be a violation of Plaintiff's constitutional rights.

Indeed, in *Maros, supra*, 2024 WL at *7, the court granted the officer qualified immunity, finding that, "it is not the case that a reasonable officer in Cure's position would have realized that

22

she was precluded from subjecting a suspect to a *Terry* stop within the curtilage of his home." *See also Rivera, supra*, 57 Fed. Appx. at 562 (finding that since officers were entitled to conduct a *Terry* stop outside the apartment, officers were still permitted to conduct a *Terry* stop inside the apartment, despite Plaintiff retreating into his apartment.) Moreover, as of the time of this incident, it was firmly established in Maryland that the community caretaking doctrine applied to homes. *Olson v. State*, 208 Md. App. 309, 346, 56 A.3d 576, 598 (2012) (gathering cases), and State case law has a "voice" in whether a law, which MCPD was operating under, was clearly established, for purposes of qualified immunity. *Phillips v. Peddle*, 7 F. App'x 175, 179 n.3 (4th Cir. 2001) (granting qualified immunity to officer who entered home acting under the community caretaker doctrine). As such, the officers are entitled to qualified immunity.

### d. Qualified Immunity Applies to Officers Who Act in Reasonable Reliance on Information Provided by Other Officers.

Furthermore, "[p]olice officers routinely rely on information from other officers, and reliance—absent clear, contradictory evidence—is reasonable." *Rose v. Centra Health, Inc.*, No. 6:17-CV-00012, 2017 WL 3392494, at *4 (W.D. Va. Aug. 7, 2017); *Lucas v. Shively*, 31 F. Supp. 3d 800, 813 (W.D. Va. 2014) ("Indeed, a police force could not function without reasonable reliance on the statements and efforts of others.")

Even if the action is found to be in violation of the Fourth Amendment, "officers who reasonably relied on fellow law enforcement are shielded from individual liability." *Rose, supra*, at *4 (citing *United States v. Hensley*, 469 U.S. 221, 232 (1985) ("In such a situation, of course, the officers making the stop may have a good-faith defense to any civil suit."); *Liu v. Phillips*, 234 F.3d 55, 57 (1st Cir. 2000) ("Where the authorizing officer has made a factual mistake but the mistake is not apparent, immunity for the officer who reasonably assisted is well settled." (citations omitted)); *Lucas v. Shively*, 31 F. Supp. 3d 800, 813-17 (W.D. Va. 2014), *aff'd*, 596 F. App'x 236

23

(4th Cir. 2015)). "This is because qualified immunity protects officers who 'could reasonably believe that their actions were lawful.'" *Rose v. Centra Health, Inc.*, No. 6:17-CV-00012, 2017 WL 3392494, at \*4 (W.D. Va. Aug. 7, 2017) (citing *Henry v. Purnell*, 652 F.3d 524, 531 (4th Cir. 2011)).

Such reasonable reliance is demonstrated in *Wells v. Fuentes*, No. 122CV00140MSNIDD, 2023 WL 3791390, at \*1 (E.D. Va. June 2, 2023), where a civilian law enforcement officer employed by the Department of the Army, Officer Armstrong, approached a parked vehicle in Arlington National Cemetery because Ofc. Armstrong believed that something was amiss, and he wanted to check to see if the plaintiff was having a medical emergency or having vehicular problems. Upon approaching the vehicle, Ofc. Armstrong noticed that the plaintiff's temporary license plate was expired and Ofc. Armstrong requested assistance from the Arlington County Police Department ("ACPD"). *Id*. The plaintiff testified that Ofc. Armstrong's vehicle was parked in such a way that he did not feel he was free to leave. *Id.* When Arlington County police officers arrived, Ofc. Fuentes (ACPD) ordered Plaintiff to step outside of the vehicle and asked if there were firearms inside. *Id.* After the plaintiff confirmed there were firearms inside the vehicle, the plaintiff was placed in handcuffs and the firearms were taken into officers' possession for the duration of the stop. *Id.* Officers cited the plaintiff for operating his vehicle without a valid license and for bearing an improper registration in violation of Virginia law. *Id.* As relevant here, the plaintiff alleged that ACPD officers violated his Fourth Amendment rights when they continued Ofc. Armstrong's alleged improper detention. *Id.* at \*11. In response, the *Wells* court held, *id.*:

> [I]t is well-settled that officers in one jurisdiction are "entitled to rely on the determination of [an officer from] another jurisdiction that there is reasonable suspicion to stop a person." *United States v. Avagyan*, 164 F. Supp. 3d 864, 884 (E.D. Va. 2016). Officers responding to a call for assistance are "not required to conduct an independent investigation of facts to come to their own determination"—indeed, "[s]uch a requirement would be unworkable in the

24

environments in which the police operate." *Guerrero v. Deane*, 750 F. Supp. 2d 631, 652 (E.D. Va. 2010). Thus, even if Officer Armstrong's decision to stop Plaintiff was improper, the responding ACPD Officers would not be liable for the continuation of that detention. *See United States v. Hensley*, 469 U.S. 221, 232, 105 S. Ct. 675, 83 L. Ed. 2d 604 (1985) (noting that officers who rely on information from another in good faith "may have a good-faith defense to any civil suit"). Here, the ACPD Officers were responding to Officer Armstrong's call for assistance with a stop already in progress. As such, the responding officers were permitted to (and did) rely on Armstrong's determination that the detention was warranted in good faith. And because Plaintiff alleges no facts that suggest otherwise, he has failed to show how the officers' conduct was unreasonable.

Here, even if the Court were to conclude that Sgt. Diaz's entry and detention violated Plaintiff's Fourth Amendment rights, then Officers Min, Dolan and Lenhart are still entitled to qualified immunity, as they reasonably relied upon the actions and information received from Sgt. Diaz when they responded to the priority call for kidnapping of children. Ofc. Min and Ofc. Dolan did not arrive until later in the conversation between Sgt. Diaz and Plaintiff. Therefore, Ofc. Min and Dolan relied on Sgt. Diaz to possess the full scope of information necessary to make a determination of whether entry into the home was justified. Consequently, when Sgt. Diaz acted to prevent the door from shutting and to further detain Plaintiff, Ofc. Min could reasonably conclude that Sgt. Diaz's actions were legally justified, and that she had legal justification to assist Sgt. Diaz in the detention. Ofc. Dolan, who also arrived later in time, could reasonably conclude that her fellow officers' actions were legally justified, and act to assist her fellow officers, by speaking with Mrs. Hayat and checking on the welfare of the children. Likewise, Ofc. Lenhart arrived at the scene after entry into the residence and observed Sgt. Diaz and Ofc. Min trying to place Plaintiff into handcuffs. Again, Ofc. Lenhart could reasonably conclude when he arrived on scene, that Sgt. Diaz and Ofc. Min were satisfied they had sufficient factual information to provide legal justification for entry and detainment, and that he therefore had legal justification to assist. Officers Min, Dolan, and Lenhart were not required to conduct their own independent investigation

25

of the facts, and were permitted to reasonably rely, as they did here, on their fellow officers, even if their fellow officers' conduct is somehow rendered unconstitutional. *See supra*, *Rose*; *Wells*.

For all of these reasons, Ofc. Min, Ofc. Dolan, and Ofc. Lenhart are entitled to qualified immunity as to the entry into the residence and detention of Plaintiff based upon their lawful reliance of the actions of their fellow officers.

### 2. Use of Force

#### a. The Use of Force Was Constitutional Because It Was Objectively Reasonable and Was Not Excessive.

The Courts have "long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion … to effect it." *Graham v. Connor,* 490 U.S. 386, 396 (1989). "'Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers,' *Johnson* v. *Glick*, 481 F. 2d, at 1033, violates the Fourth Amendment." *Graham*, 490 U.S. at 396. "An efficient, lawful arrest of a resisting suspect that causes the suspect to suffer only de minimis injuries does not constitute excessive force." *Pegg v. Herrnberger*, 845 F.3d 112, 120 (4th Cir. 2017). "Applying 'just enough weight' to immobilize an individual 'continu[ing] to struggle' during handcuffing is not excessive force." *Estate of Armstrong v. Vill. of Pinehurst*, 810 F.3d 892, 906 n.11 (4th Cir. 2016) (quoting *Estate of Phillips v. City of Milwaukee*, 123 F.3d 586, 593 (7th Cir. 1997)).

In determining whether an officer's use of force is constitutional under the Fourth Amendment, the Court examines whether the use of force was reasonable. "[T]he test of reasonableness under the Fourth Amendment . . . requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 899 (internal citations

omitted). This Court has held that an officer's use of force was reasonable even in cases where a non-violent crime has occurred and the officer is not concerned for his own safety, as long as the other *Graham* factor (resisting arrest) is met. *Souder v. Toncession*, No. CIV. A. AW-07-1996, 2009 WL 4348831, at *5-6 (D. Md. Nov. 30, 2009).

"The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Armstrong*, 490 U.S. at 396. "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments -- in circumstances that are tense, uncertain, and rapidly evolving -- about the amount of force that is necessary in a particular situation." *Id.* at 396-97. "The 'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* at 397. Under the reasonableness standard, "[t]he question is whether a reasonable officer in the same circumstances would have concluded that a threat existed justifying the particular use of force." *Anderson v. Russell*, 247 F.3d 125, 129 (4th Cir. 2001). "The court's focus should be on the circumstances at the moment force was used and on the fact that officers on the beat are not often afforded the luxury of armchair reflection." *Elliott v. Leavitt*, 99 F.3d 640, 642 (4th Cir. 1996) (citing *Greenidge v. Ruffin*, 927 F.2d 789, 791-92 (4th Cir. 1991)).

The undisputed facts, when viewed in the light most favorable to the Plaintiff, fail to support that the use of force by any officer was excessive or objectively unreasonable. As to Ofc. Dolan, there has been no testimony that she ever touched Plaintiff. As to Sgt. Diaz and Ofc. Min, Plaintiff had already used force to shut the door against the officers' efforts, and these officers needed to further investigate the priority call for kidnapping of children and check on the welfare

of the children, and to do so safely.  That said, Sgt. Diaz and Ofc. Min were faced with a very belligerent Plaintiff in the foyer, who was highly agitated and screaming, and had already shown force by forcefully shutting the door against officers' efforts. Plaintiff's volatility posed a threat and/or safety concern to the officers and others in the house and were impeding officers' ability to check the welfare of the children. Plaintiff refused to comply with commands.  Officers decided to handcuff Plaintiff, and he was actively resisting officers' efforts to handcuff him. Since Plaintiff was refusing to be handcuffed and Plaintiff is taller than both Sgt. Diaz and Ofc. Min, commands were given to Plaintiff to get on the ground in order to effectuate handcuffing safely, as it is easier to gain control of a subject who is resisting when he is on the ground as it minimizes the likelihood of needing to use higher levels of force. When Ofc. Lenhart arrived, he was confronted with this scene, and he assisted Sgt. Diaz and Ofc. Min with taking Plaintiff to the ground, using control techniques to physically restrain Plaintiff, while minimizing the potential for injury to both Plaintiff and the officers. Once Plaintiff was handcuffed, the officers assisted him to a seated position, and then had him sit on a bench. Importantly, no strikes, punches, kicks, hits, or weapons were used against Plaintiff. The only physical contact was to take him to the ground and handcuff him for a brief period of time while the officers determined whether the children were safe.

 For all of these reasons, Sgt. Diaz, Ofc. Min and Ofc. Lenhart's use of force was objectively reasonable and was not excessive.

### b. Alternatively, Defendants Are Entitled to Qualified Immunity with Respect To Count IV, Use Of Force.

Should the Court find that any Officer used excessive force on Plaintiff, each Officer is entitled to qualified immunity.  Defendants incorporate the discussion regarding the standard for qualified immunity set forth in Section IV(A)(1)(c).

Further, in analyzing an officers' entitlement to qualified immunity in an action premised on an officer's use of excessive force, the reasonableness of the officer's use of force "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham v. Connor*, 490 U.S. 388, 396 (1989). If a reasonable officer could have believed that his conduct was lawful, then qualified immunity attaches. *McLenagan v. Karnes*, 27 F.3d 1002, 1007 (4th Cir. 1994). "The very idea of reasonableness requires that courts accord interpretative latitude" to the officer's judgments. *Torchinsky v. Siwinski*, 942 F.2d 257, 261 (4th Cir. 1991). " If reasonable mistakes were actionable, difficult questions of discretion would always be resolved in favor of inaction, and effective law enforcement would be lost." *Id.* Furthermore, the subjective intent of the official is irrelevant. If the officer acts in an objectively reasonable manner, he or she is entitled to qualified immunity, even if the officer has violated the plaintiff's rights. *Graham*, 490 U.S. at 397.

In the interest of judicial economy, and to avoid needless repetition, the Court is respectfully referred to the arguments contained in Section IV(A)(2)(a), since the same facts and arguments regarding the appropriateness of the force used applies here. The record is clear that an objectively reasonable police officer, who was investigating an on-going priority call for the kidnapping of children and/or was acting to render emergency assistance pursuant to *Brigham*, and was confronted with a volatile and belligerent Plaintiff, who was not cooperating with police commands and was resisting being handcuffed, would believe that it was reasonable and necessary to use physical force to accomplish the handcuffing. The force used to handcuff Plaintiff was necessary and objectively reasonable to control Plaintiff, who was taller than both Sgt. Diaz and Ofc. Min, and who was refusing police commands, so that officers could safely investigate and render emergency assistance pursuant to *Brigham*. There is no evidence in the record that any of

the officers used force that violated clearly established rights. Sgt. Diaz, Ofc. Min and Ofc. Lenhart used only that force that was objectively reasonable to take Plaintiff to the ground, and then to effectuate Plaintiff being handcuffed. Ofc. Dolan never touched Plaintiff. Under a totality of the circumstances, including the information known to the officers, their observations and perceptions, and their knowledge, training and experience, a reasonable officer would have believed that Sgt. Diaz, Ofc. Min and Ofc. Lenhart's conduct was lawful, and, thus, the Defendant Officers are entitled to qualified immunity.

**B.  Summary Judgment Should be Granted As to Count V, Violation of MD. Decl. of Rights Articles 24 and 26**

In analyzing claims brought under Articles 24 and 26 of the Maryland Constitution, Courts apply the same analysis employed for claims under the Fourth Amendment to the United States Constitution. *Williams v. Prince George's Cty.*, 112 Md. App. 526, 547, 685 A.2d 884, 895 (1996). Therefore, for the reasons stated above in Section IV(A), summary judgment should be granted as to Count V, as to Sgt. Diaz, Ofc. Min, Ofc. Dolan, and Ofc. Lenhart.

**C.  Summary Judgment Should Be Granted as to All Counts Against Does 1-10**

To the extent the Court has jurisdiction over the unidentified Does 1-10, summary judgment should be granted in their favor. The U.S. Court of Appeals for the Fourth Circuit has stated that "[t]he designation of a John Doe defendant is generally not favored in the federal courts; it is appropriate only when the identity of the alleged defendant is not known at the time the complaint is filed and the plaintiff is likely to be able to identify the defendant after further discovery." *Chidi Njoku v. Unknown Special Unit Staff*, 217 F.3d 840 (4th Cir. 2000); *see also Schiff v. Kennedy*, 691 F.2d 196, 198 (1982) ("[I]f it does not appear that the true identity of an unnamed party can be discovered through discovery or through intervention by the court, the court

30

could dismiss the action without prejudice.") Applying these principles at the close of discovery and at the summary judgment stage, trial courts in the Fourth Circuit have grant summary judgment in favor of John Doe defendants. *See, e.g.*, *Myers v. City of Charleston*, No. 2:19-CV-00757, 2021 WL 925326, at *10 (S.D.W. Va. Mar. 10, 2021) ("Plaintiffs here have had more than ample time to discovery, disclose the identifies of, and serve the 25 John Does designated in their complaint . . . . Because these 25 John Does have not been served and cannot have a judgment entered against them, they must be dismissed from this action."); *Gennell v. Denny's Corp.*, 378 F. Supp. 2d 551 (D. Md. 2005) (granting defendant's motion for summary judgment and dismissing claims against Defendant John Doe).

In the instant case, discovery has now closed, and "Does 1-10" have yet to be identified in the pleadings or served with the Complaint. Accordingly, to the extent the Court has jurisdiction over Does 1-10, summary judgment should be entered in favor of "Does 1-10" for the remaining causes of action in Plaintiff's Amended Complaint—Counts IV & V.

### D. <u>Summary Judgment Should Be Granted as to Punitive Damages</u>

Pursuant to the Court's Memorandum Opinion and Order (ECF No. 35, p.10), Plaintiff may only seek monetary damages against Defendant Officers in their individual capacities. "[A] jury may be permitted to assess punitive damages in an action under § 1983 when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Smith v. Wade*, 461 U.S. 30, 56 (1983).

There is no evidence in the record that any Defendant Officer acted with evil motive or intent or acted with reckless or callous indifference to Plaintiff's Fourth Amendment rights. The facts clearly demonstrate that the officers responded to a priority call for kidnapping of children initiated by a concerned and alarmed citizen. Police officers conducted an investigation into the

31

facts provided by ECC, which led them to Plaintiff's residence. Prior to arriving at Plaintiff's residence, police spoke to the original complainant, Mr. Ayala Solano, who confirmed that he was concerned for the welfare of the children at the IHOP because he observed a "black male open the trunk [of the suspect vehicle], yell at the kids, and close the trunk." Officers were made aware of the possibility that the suspect vehicle had rear-facing seats, but this fact could not be confirmed without a visual inspection of the vehicle and did not dispel suspicion since children can be kidnapped irrespective of where they are placed in a vehicle. Furthermore, in 2013, Teslas only made one model vehicle, the "Model S", which had an option for rear-facing child seats, and this was not standard. EVSpecifications, www.evspecifications.com/en/brand/b1e92.

After arriving at Plaintiff's residence, police engaged in a consensual encounter by speaking to Plaintiff and his then wife outside their residence. During this encounter, police learned additional facts that heightened their concern for the children's welfare. These facts included Plaintiff seemingly anticipating the officers' arrival, Plaintiff avoiding answering questions about his activity at the IHOP, Plaintiff's deflection of questions and evasive behavior, and Plaintiff cutting off a conversation initiated by his then wife to gather more information about the reported kidnapping. With the officers' suspicions and concerns unabated, Sgt. Diaz legally entered the residence and detained Plaintiff for a brief investigatory detention and under *Brigham* to ascertain the children's welfare. *See supra,* Section IV(A). Ofc. Min, Ofc. Dolan, and Ofc. Lenhart arrived at the scene later in time, and they acted reasonably in assisting their fellow officer(s). *See supra,* Section IV (A). No strikes, hits, punches, kicks, or weapons were used against Plaintiff at any time. Indeed, Ofc. Dolan did not have any physical contact with Plaintiff whatsoever. Furthermore, if qualified immunity is granted to any one of the officers, then punitive damages cannot be rendered against that defendant. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

Given the complete absence of any evidence in the record that Defendant Officers acted with "reckless or callous indifference to the federally protected rights" of Plaintiff, or that their actions were motivated by evil motive or intent, summary judgment must be granted to each of the Defendant Officers on the punitive damages claims in Counts IV & V.

### E. Summary Judgment Should Be Granted in Favor of Chief Jones

The only remaining claim against Chief Jones is an official capacity suit as Chief of Police, seeking injunctive relief, under Count IV, Violation of 4th Amendment Rights under 42 U.S.C. § 1983. *See* ECF No. 35.  A claim against Chief Jones in his official capacity is essentially a claim against the County, and the County has already been named as a Defendant, under a *Monell* claim in Count IV, and in connection with Plaintiff's claim for injunctive relief. Therefore, the official capacity suit against Chief Jones should be dismissed with prejudice as duplicative of the claim against the County. *See Kentucky v. Graham*, 473 U.S. 159, 166, 105 S. Ct. 3099, 3105 (1985) ("[a]n official capacity suit is, in all respects other than name, to be treated as a suit against the [governmental] entity….It is *not* a suit against the official personally, for the real party in interest is the entity."); *Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 690, n.55 (1978) (official capacity suits "generally represent only another way of pleading an action against an entity of which an officer is an agent"); *Jenkins v. Kurtinitis*, 2015 WL 1285355, at *35 (D. Md. Mar. 20, 2015) (court dismisses claims against community college employees, as "these are in effect claims against CCBC [the community college] itself [and] any claims against other defendants in their official capacities are merely duplicative…").

Neither *Will v. Mich. Dep't of State Police*, 491 U.S. 58 (1989) nor *Antrican v. Odom*, 290 F.3d 178 (4th Cir. 2002) are instructive on this issue, as both cases dealt with suits against a State

and/or State officials under §1983, not a municipality, which is distinct under the law, as further set forth below.

In *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 60 (1989), the United States Supreme Court was faced with the question of whether a State, or a State official, while acting in his/her official capacity, is a "person" within the meaning of §1983. The Supreme Court reaffirmed that the State is not a person within the meaning of §1983. *Id.* The *Will* Court identified distinctions between municipalities and the State under §1983, explaining that:

> it does not follow that if municipalities are persons then so are States. States are protected by the Eleventh Amendment while municipalities are not, *Monell*, 436 U.S., at 690, n. 54, and we consequently limited our holding in *Monell* 'to local government units which are not considered part of the State for Eleventh Amendment purposes,' *ibid*. Conversely, our holding here does not cast any doubt on *Monell*, and applies only to States or governmental entities that are considered 'arms of the State' for Eleventh Amendment purposes.

491 U.S. at 70.

The *Will* court further explained *Monell*'s holding, finding that a municipality is a person under §1983, is consistent with historical changes in the law, as by the time §1983 was enacted, municipalities no longer retained the sovereign immunity they had previously shared with the State, and could be held liable for previously immune activities. 491 U.S. at 67 n.7. Therefore, when the *Will* court noted that, "***a state*** official in his or her official capacity, when sued for injunctive relief, would be a person under § 1983 because 'official-capacity actions for prospective relief are not treated as actions against ***the State***'", the Supreme Court explained that, "[t]his distinction is 'commonplace in sovereign immunity doctrine,' and would not have been foreign to the 19th-century Congress that enacted § 1983." 491 U.S. 71 n. 10 (internal citations omitted)(emphasis added). The *Will* court further explained the distinction between the State and municipality under §1983, by setting forth that unlike the State under §1983, there is a bifurcated

34

application to municipalities under §1983 depending on the nature of the relief sought against the municipality, since municipalities are not protected by sovereign immunity. *Id.*

In *Antrican v. Odom*, 290 F.3d 178, 182 (4th Cir. 2002), plaintiffs commenced a class action under 42 U.S.C. §1983 against North Carolina State officials in their official capacities to obtain declaratory judgment and injunctive relief. *Id.* The district court denied North Carolina State officials' motion to dismiss, in which defendants argued that since they had been sued in their official capacities, they were entitled to sovereign immunity under the Eleventh Amendment, and that the exception to such immunity under *Ex Parte Young*, 209 U.S. 123 (1908), did not apply. *Id.* at 184. The Fourth Circuit, on interlocutory appeal, affirmed the district court's ruling on the Eleventh Amendment immunity and declined to exercise jurisdiction on the remaining grounds raised in the motion to dismiss. *Id.* The Fourth Circuit explained:

> [t]he *Ex Parte Young* exception to Eleventh Amendment immunity is designed to preserve the constitutional structure established by the Supremacy Clause. Thus, it allows private citizens, in proper cases, to petition a federal court to enjoin State officials in their official capacities from engaging in future conduct that would violate the Constitution or a federal statute. . . But "just because a private citizen's federal suit seeks declaratory injunctive relief against State officials does not mean that it must automatically be allowed to proceed under an exception to the Eleventh Amendment protection." . . . in applying the *Ex Parte Young* exception to Eleventh Amendment immunity, we must evaluate the respective State and federal interests, applying *Ex Parte Young* narrowly "so as not unduly to erode the important underlying doctrine of sovereign immunity" while still protecting the supremacy of federal law. *Id.* at 184-185.

Montgomery County is a municipality, not a State, and therefore neither the Eleventh Amendment nor exceptions under *Ex Parte Young* are applicable to the instant case. As demonstrated in *Will* and *Antrican*, municipalities are treated distinct from the State under §1983, and therefore neither *Will* nor *Antrican* are applicable to the instant case.

For these reasons, summary judgment should be granted in favor of Chief Jones.

 **F.**  **If The Court Finds That Entry into The Residence Was Constitutional, Then The *Monell* Claim Under Count IV Is Necessarily Extinguished And Judgment Should Be Entered In Favor Of Chief Jones And The County under Count IV**

Plaintiff alleges that Montgomery County has a policy or practice of breaking into citizens' homes when citizens do not consent to a search of the citizens' home. ECF No. 19, ¶ 97. To prove this *Monell* claim against the County, Plaintiff must first establish that the Defendant Officers' entry into his home violated his Fourth Amendment rights. *Tserkis v. Baltimore Cnty.*, No. CV ELH-19-202, 2019 WL 4932596, at *4 (D. Md. Oct. 4, 2019). Therefore, if the Court finds that the officers' entry into the residence was constitutional, then Plaintiff's *Monell* claim under Count IV is necessarily extinguished, requiring judgment in favor of Chief Jones and the County under Count IV. *Id.*

 **G.**  **If The Court Enters Summary Judgment Under Count V Against Sgt. Diaz, Ofc. Min, Ofc. Dolan, And Ofc. Lenhart, Then Judgment Should Be Entered In Favor Of The County As To Count V**

Plaintiff alleges under Count V that Sgt. Diaz, Ofc. Min, Ofc. Dolan and Ofc. Lenhart violated Articles 24 and 26 of the Maryland Constitution. Plaintiff claims that the County is vicariously liable for said alleged violations. For the reasons stated above in Section IV(B), Defendant Officers are entitled to summary judgment on Count V, and as such, the County is entitled to summary judgment with respect to Count V.

 **V.**   **CONCLUSION**

**WHEREFORE**, the foregoing considered, Defendants respectfully request that this Honorable Court grant Defendants' Motion for Summary Judgment and enter judgment in favor of all Defendants with respect to all claims and dismiss this action with prejudice.

Respectfully Submitted,

JOHN MARKOVS
COUNTY ATTORNEY

_____/s/_____

Patricia Lisehora Kane
Chief, Litigation Division
Bar No. 13621
patricia.kane@montgomerycountymd.gov

_____/s/_____

Jeannette L. Frumkin
Assistant County Attorney
Federal Bar No. 19711
jeannette.frumkin@montgomerycountymd.gov

_____/s/_____

Aaron Ramirez
Assistant County Attorney
Federal Bar No. 30812
aaron.ramirez@montgomerycountymd.gov

Attorneys for Defendants
101 Monroe Street, Third Floor
Rockville, Maryland 20850
(240) 777-6700