**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| FAREED NASSOR HAYAT | * | |
| | * | |
| Plaintiff | * | |
| | * | |
| v. | * | Civil Action No. 8:20-cv-02994-LKG |
| | * | |
| SGT. CASEY DIAZ, ET AL. | * | |
| | * | |
| Defendants | * | |

## PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Plaintiff, Fareed Hayat, by and through his undersigned attorneys, hereby submits his Opposition to Defendants' request for Summary Judgment. Defendants' argument that reasonable articulable suspicion is grounds for entering a dwelling so long as an investigating officer develops that suspicion before an individual enters their home has been previously proposed and rejected in this Court. *See Allotey v. Baltimore Cnty., Maryland,* No. 1:21-CV-02288- JMC, 2022 WL 17105120, at *6 (D. Md. Nov. 22, 2022). Rather, the exceptions for entering a home without voluntary consent have been well established for decades. *Groh v. Ramirez*, 540 U.S. 551, 564, 124 S. Ct. 1284, 1294, 157 L. Ed. 2d 1068 (2004) ("No reasonable officer could claim to be unaware of the basic rule, well established by our cases, that, absent consent or exigency, a warrantless search of the home is presumptively unconstitutional."). For this reason alone the Court may properly, and indeed must, deny Defendants' Motion.

However, Defendants' Motion fails to pass muster even on its own flawed premise. Under the light most favorable to the Plaintiff, the existence of reasonable articulate suspicion is not even close. Defendants acknowledge the weakness of their argument by repeatedly referring

to two "undisputed" facts that were never communicated to Sgt. Casey Diaz: 1) the fact that children had been tied up; and 2) that Tesla's *might not* have rear facing seats. The facts communicated to Sgt. Diaz were directly to the contrary: Officer Moran's deposition testimony that the first-hand witness to the incident said the children had been tied up appears nowhere in the evidentiary record and Officer Moran explicitly told all officers that Tesla's had "possible rear-facing seats in the trunk that are legal." As Defendants recognize, only those facts that are within the knowledge of the officers involved in the purported investigatory stop are relevant in the analysis. Defendants did not have reasonable suspicion to conduct a *Terry* stop and their contemporaneous statements made on the scene that night acknowledge it. *See, e.g.,* **Exh. C** (Bodycamera footage of Officer Nicole Min) **00:03:50** ("what people don't realize is that a Tesla has rear facing seats, and people don't know that").

Finally, if Defendants had no reasonable articulable suspicion that a crime was underway, he also had no exigent basis for entering Plaintiff's family home and also could not have been functioning under any community care taking principle. For the reasons set forth below, Defendants Motion must be denied.

### I. <u>Facts</u>

On October 22, 2017, the Montgomery County emergency call service received a report from an individual that he "was told by another drive that he saw someone grab three children and put them in the trunk of a vehicle." **Def. Ex. 1, 00:00:18-28**. This individual, who identified himself only as "Luis," stated to the emergency call service that he had not actually seen anything, but was given a license plate number by the first-hand witness and told to follow the car. **Exh. B, 38:21-39:15.** While the license plate provided by "Luis" was matched to a black Tesla registered to an address of 1 Eastmoor Drive in Silver Spring, MD (the "home") the car

that "Luis" was following was actually a white Range Rover. **Id. 42:19-43:2.** The caller to 911 provided no identifying information for the three children and no identifying information for the suspect other than that he was a black male. **Def. Ex. 1 00:01:19-32.** A few moments later, Officer Moran reported to the other police officers over radio: "Teslas have rear-facing seats in the trunk, so they might be able to sit there." ***Id.* at 00:02:40-47.**

Officer Moran later made contact with the original witness to the incident, who then reported to the other officers over radio that: "I have the original complainant here. He says that he was at the IHOP in Langley Park, that he saw the black male open the trunk, yell at the kids, and close the trunk, but like I said, they might have possible rear-facing seats in the trunk that are legal." **Def. Ex. 1, 00:04:28-50.** Officer Moran testified on April 5, 2024 that the first-hand witness observed the suspect "tie up the children" **Def. Ex. 3, 12:18**, but this fact was not communicated to officers on October 22, 2017 and there is no record of this observation anywhere in the factual record. To the contrary, the totality of information related to the incident Sgt. Diaz had received at that time was that:

1) an individual provided a hearsay report to 911 from an anonymous witness who saw a black man grab three children and put them in the trunk of a vehicle;

2) the 911 dispatcher classified this incident as a kidnapping;

3) the vehicle the anonymous caller had seen was a Tesla that has rear-facing seats in the trunk so the children "might be able to sit there";

4) the hearsay reporter had been asked to follow the Tesla but had instead followed a white Range Rover;

5) the original complainant (who remained anonymous at this point) amended the report to state that the black man had only "yell[ed] at the kids" in the trunk and close the trunk as opposed to grabbing them and throwing them in; and

6) Tesla's had "possible rear-facing seats in the trunk that are legal." **Ex. A (Deposition Transcript of Sgt. Casey Diaz), 123:20-125:10.**

After receiving this information, Sgt. Casey Diaz arrived at Plaintiff's home with his sirens on, but *turned them off* when he reached the home to avoid alerting Plaintiff and his family to the presence of police. **Def. Ex. 5.** (Affidavit of Sgt. Casey Diaz). Sgt. Diaz also did not park his car in any manner so as to block access to the street or driveway in front of Plaintiff's home. **Ex. A, 131:4-16.** As he approached Plaintiff's family home, Sgt. Diaz observed Plaintiff and his wife Mrs. Hayat on the porch. The three of them then engaged in the following conversation:

**Sgt. Diaz:** "Hi, how are you doing? Everything okay here?"

**Plaintiff:** [indiscernible]

**Sgt. Diaz:** "Were you guys just at the IHOP down in Langley Park?"

**Plaintiff:** "What's the problem?"

**Sgt. Diaz:** "We got a call of a kidnapping, or something like that, were you guys down at the IHOP?"

**Plaintiff:** "There is no kidnapping here, sir."

**Sgt. Diaz:** "What?"

**Plaintiff**: "There is no kidnapping here, sir."

**Sgt. Diaz:** "Okay, well I just need to make sure everybody is ok."

**Plaintiff:** "Okay...how are you going to do that?"

**Sgt. Diaz:** "Well, we are talking. We are talking."

**Plaintiff:** "Everything is ok here."

**Sgt. Diaz:** "Well, I need to check. Are there any kids here?"

**Plaintiff:** "Yes."
**Sgt. Diaz:** "Well, can we see them?"

**Plaintiff:** "You cannot come into our house. We are both lawyers. I am a professor at the University of Howard, she is a professor at UDC. This is our home. You do not have a warrant. You are not coming in our home."

[Overheard in the background] **Mrs. Hayat**: "I am a professor of law."

**Sgt. Diaz:** "Can you come down here for a second?"

**Plaintiff:** "I cannot."

**Mrs. Hayat:** "Can you explain to us what is going on here?"

**Sgt. Diaz:** "Yeah, somebody saw something involving some kids at an IHOP . . . "

**Plaintiff:** "Norrinda, walk into our home please. Walk into our home. If you would like to come into our home without a warrant. . ." *See* **Def. Ex. 7.**

Once Plaintiff and his wife had entered their home and shut the door, Sgt. Diaz then ordered Plaintiff to "open the door." **Def. Ex. 7, 00:01-41-00:01:47.** Plaintiff responded "you are not allowed in our house." **Id**. Sgt. Diaz, with the help of Officer Nicole Min and Nathan Lenhart, then forced their way into Plaintiff's family home. **Def. Ex. 9** (Body Camera of Ofc. Nathan Lenhart, 00:00:000 – 00:00:20. Plaintiff repeatedly told Defendants Diaz, Min, and Lenhart that they could not be in his home. *See generally* **Def. Ex. 9.** Plaintiff was eventually taken to the ground by these three officers against his will, handcuffed, and restrained on the ground in handcuffs. **Def. Ex. 10, 78:13-79:4.** Plaintiff's wife recalls that an officer placed a Taser against Plaintiff's back and pulled the trigger, but the Taser did not fire. **Ex. G., 31.** Plaintiff's mouth was bloodied in the altercation, and has later suffered emotional trauma from the invasion and from the need to educate his children to fear the police. **Ex. J.** (Plaintiff's Responses to Interrogatories).

In the aftermath of the officers' invasion of Plaintiff's family home, Officer Nicole Min stated the following to Mr. Randy McDonald, Plaintiff's attorney:

*"It was an exigency. The originating call. It was a kidnapping. They don't know that. They said they threw them into the trunk. What they don't realize is that the Tesla has a trunk with car seats and people don't know that. And that he shut the trunk with the kids in the trunk. That's the call we got. It literally said that."* **Ex. B. 00:03:20-00:03:58.**

Mr. McDonald subsequently asked Officer Min "when did [she] realize that a Tesla has seats in the trunk?" To which she replied, "I don't know a Tesla, I'm not rich enough to know a Tesla." **Id. 00:05:26-00:05:50.** Officer Min later laughed about the incident, **Ex. C, 108-110,** and another officer stated: "It's a misunderstanding. Everybody is good to go. But everyone was so hostile towards the police that it created such a big issue." **Ex. K** (body camera of unknown officer) **T00:30:13Z.**

Sgt. Casey Diaz is familiar with the law of voluntary police encounters (called "accosting" in his terminology) and acknowledges that a citizen can terminate a voluntary encounter with a police officer at any time. **Ex. A 46:18-47:3.** Similarly, Sgt. Diaz acknowledges that a citizen's right to terminate the encounter ceases only when an officer has made a seizure. **Id. 42:6-19,** and that a citizen must understand that they are not free to go in order for a seizure to be effective, **Id. 52:2-7.**

When arriving at Plaintiff's family home, Sgt. Diaz was aware that 911 received a report from an anonymous caller who had not actually seen anything relating to a kidnapping. **Ex. A, 91:8-13.** Sgt. Diaz was also aware that there was a report that Teslas had rear-facing seats. **Ex. A**, **100:7-15.** In fact, Sgt. Diaz had received that information twice before reaching Plaintiff's home. **Ex. A, 116:3-118:21.** Sgt. Diaz had no identifying information about the children, and no information about the suspect other than that it was a black male. **Ex. A, 125:18-130:15.**

During the conversation on the porch, Sgt. Diaz described Plaintiff as "respectful" and acknowledged that Plaintiff had not raised his voice during. **Ex. A, 133:21-134:16.** Despite the fact that Sgt. Diaz made no outward indications that Plaintiff was not free to terminate the encounter nor ever tell him he was not free to go, Sgt. Diaz believed that, following their conversation, both Plaintiff *and his wife* were not free to go. **Ex. A, 141:6-20.** Summarizing all of the information about his conversation with Plaintiff up until the point Plaintiff terminated the encounter, Sgt. Diaz testified in narrative form:

> "I think it's significant that Mr. Hayat was already on his porch when I arrived. Then we have our conversation, which I can sort of describe generally, but obviously, there was a body-worn camera, so we can get the exact quotes. But generally, I asked him about—you know, I tell him we got a call about a kidnapping in Langley Park at an IHOP, and I asked him if he was at the IHOP. He doesn't answer that question. He immediately says, There's no kidnapping here. Okay? Mrs. Hayat comes out. She's on the front porch too. I start to ask if everybody is okay. He says they are. I said, well, I need to make sure. He says, well, how are you going to do that? And I say something like, well, we're talking, meaning, you know, I'm going to ask you some questions, you know, and we'll go from there.
>
> From there, I asked if there are kids here. He says there are. I said I'd like to see them. You're not seeing my kids. During this conversation, and again, I'm not sure at the exact point, but the information comes out that he's a law professor, him and his wife teach at various schools in the area.
>
> Those questions, in my mind, come at a time when I'm trying to get information about the kids. I view that in addition with the fact that he didn't answer if they were coming from an IHOP as sort of like trying to deflect or avoid those questions, which in my mind, is suspicious.
>
> [colloquy between counsel] . . .
>
> Mrs. Hayat starts to ask me to explain exactly what is going on here, and so I tried to start to explain. And at this point, I believe Mr. Hayat says something and then starts to usher her inside. And again, all of this is happening within— very fast, very fluid. Okay? So at that point, in my mind, I find it suspicious that he is stopping her—or trying to usher her back inside to not allow me to explain to her what is going on. So in my mind, she may have some information as to what happened at the IHOP, she may have some information as to what is the welfare of the children involved.
>
> So in order for me to complete my investigation and determine whether a kidnapping has occurred or not and if the welfare of the children are okay, I view her as a necessary component in that, so she is not free to go.
>
> Q: Okay. And did you tell her that?

*A: No.*
*Q: Okay. And you believe that she's required to talk to you.*
*A: I don't know that I would say I believe she was required to speak to me.*
*Q: Okay. You believe Mr. Hayat was required to speak to you.*
*Ms. Haggerty: Objection. You can answer.*
*A: No, I don't think he was required to speak to me."* **Ex. A 141:6-147:9.**

Sgt. Diaz acknowledges that Plaintiff never struck, hit, or assaulted any officers. **Ex. A, 151:4-155:21.** Sgt. Diaz also did not actually conduct any welfare check on the children. **Ex. A, 164:4-7; 166:13-20.** Diaz eventually received information from other officers, however, that the children "physically appeared to be fine." **Id., 166:21-167:4.** It was in fact Ofc. Brooke Dolan who checked on the three children, even though she had no identifying information related to which children she was supposed to check on. **Ex. F, 27.**

Despite this knowledge, Sgt. Diaz filed a report with Maryland Child Protective Services because he thought "it was significant enough that there was, you know, an incident at the IHOP that somebody was able to interpret as a kidnapping," **Id., 182:3-5** even though that interpretation belonged to a dispatcher hearing the second-hand report of an anonymous caller that Diaz later knew to be incorrect. **Id., 202:7-8** ("Correct. I don't think a kidnapping occurred.").

Police officers are trained to treat anonymous callers for the possibility that they "often have limited, inaccurate, or missing information." **Ex. H (Report of Russ Hicks), 16.** Indeed, the "absence of accurate information does not provide specific, articulable facts and circumstances for officers to detain individuals that may or may not be involved in the 911 call." **Id.**

## II. <u>Standard of Review</u>

Summary judgment should be granted if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). As "an

integral part" of the Federal Rules' "design to secure the just, speedy and inexpensive determination of every action," *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986), all motions for summary judgment must infer the operative facts in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris,* 550 U.S. 370, 380 (2007). This being said, if there is a dispute of fact presented by the record, application of the summary judgment standard "usually means adopting ... the plaintiff's version of the facts." *Iko v. Shreve*, 535 F.3d 225, 230 (4th Cir. 2008) (citing *Scott v. Harris,* 550 U.S. at 372).

Ultimately, summary judgment is intended to eliminate the need for trial only where the "facts are undisputed, or if disputed, the dispute is of no consequence to the dispositive question.'" *Green v. Duke Energy Corp.*, No. 1:03CV264, 2004 WL 727036, at *3 (M.D.N.C. Mar. 30, 2004), *aff'd*, 111 F. App'x 688 (4th Cir. 2004). Here, Plaintiff's position is amply supported by the factual record. It is Defendants' whose evidentiary submission that is lacking.

### III.  Argument

#### A. Defendants Legal Basis for Summary Judgment Has Already Been Refuted by this Court.

Defendants contend that the "officers' entry into the home and seizure was constitutional because [they] had reasonable articulable suspicion to seize Plaintiff for an investigatory stop *prior* to Plaintiff retreating into the home." Defendants' Memorandum in Support of Motion for Summary Judgment ("Def. Memo."), p. 14, § I(A)(1)(a) (emphasis added). In Defendants' eyes, even though Plaintiff had not been seized "up until the point when [he] attempted to shut the

police out of the residence," he *could* have been seized based on Defendant Casey Diaz's reasonable articulable suspicion had gathered, and therefore he "cannot thwart *a Terry* stop" by retreating into his home. *Citing Rivera v. Washington,* 57 Fed. App'x 558, 562 (4th Cir. 2003) ("courts have recognized that a person cannot avoid a *Terry* stop simply by retreating into a home"). Defendants then provide a list of cases to support the proposition—*Harbin v. Alexandria*, 712 F. Supp. 67, 71-72 (E.D. Va. 1989); *United States v. Santana*, 427 U.S. 38 (1976); *Maros v. Cure*, No. 6:21-CV-03346-JD-JDA, 2024 WL 1528518, at *7 (D.S.C. Jan. 24, 2024), *report and recommendation adopted*, No. 6:21-CV-3346-JD-JDA, 2024 WL 1152738 (D.S.C. Mar. 15, 2024); and *Allotey v. Baltimore Cnty., Maryland,* No. 1:21-CV-02288- JMC, 2022 WL 17105120, at *6 (D. Md. Nov. 22, 2022)—each of which involves the validity of a *Terry* stop inside a home *after* the officer has attempted to detain the individual while outside of the home.

Indeed, Judge Coulson succinctly summarized the established case law on Defendants' position in *Allotey*, which involved an officer entering a home based only on reasonable articulable suspicion:

> "To justify Officer Becketts' entry into Plaintiffs' home and the seizure of both Plaintiffs therein and outside, Defendants rely on a fallacy concerning the effectuation of a *Terry* stop within a home. Specifically, Defendants argue that there existed reasonable suspicion that a burglary was in progress and that such reasonable suspicion permitted Defendants to 'enter the residence and use minimal force to move Plaintiffs outside for further investigation.' Such an assertion cannot withstand Constitutional scrutiny." Allotey v. Baltimore Cnty., Maryland, No. 1:21-CV-02288-JMC, 2022 WL 17105120, at *5 (D. Md. Nov. 22, 2022), appeal dismissed sub nom. Allotey v. Becketts, No. 22-2312, 2023 WL 4198891 (4th Cir. Jan. 11, 2023).

Indeed, the right to retreat into one's own home and there be free from unreasonable government intrusion lies at the Fourth Amendment's "very core," *Florida v. Jardines*, 569 U.S.

1, 6 (2013). Accordingly, "without a warrant or warrant exception to enter a home, "any physical invasion of the structure of the home, by even a fraction of an inch, [is] too much ....," *Kyllo v. U.S.*, 533 U.S. 27, 37 (2001). These principles led Judge Coulson to find that "[t]here is no doubt that Defendants . . . violated Plaintiffs' constitutional right to be free from unreasonable seizure by ordering or assisting in ordering Plaintiffs, at gun point, to exit their home based merely on reasonable suspicion." *Id*. at *7. In other words, investigative *Terry* stops are not exceptions to the warrant requirement that justify entering a home if the *Terry* stop has not yet taken place.

None of Defendants cases actually support the proposition that the existence of reasonable articulable suspicion *absent an actual investigative detention* somehow serves as an undelineated exception to the warrant requirement. *See, e.g.,* Jones v. United States, 357 U.S. 493, 499 (1958) ("Exceptions to the Fourth Amendment's warrant requirement are "jealously and carefully drawn.'"); *Maros*. But this is exactly why they contend the officers' entry into Plaintiff's home was constitutional. *See, e.g.,* Def. Memo., p. 19 ("given these facts, the officers had reasonable articulable suspicion of the reported kidnapping and were justified in following Plaintiff into the home to continue investigating the suspected kidnapping.").

### B.  There Was No Reasonable Articulable Suspicion to Support a *Terry* Stop.

The *Terry* standard requires more than an inchoate and unparticularized suspicion or hunch of criminal activity. Instead, reasonable, articulable suspicion exists "when law enforcement officers possess a particularized and objective basis for suspecting the person stopped of criminal activity." *United States v. Singh*, 363 F.3d 347, 355 (4th Cir. 2004). Whether such an objective basis for suspicion exists depends on the totality of the circumstances. *United States v. Glover*, 662 F.3d 694, 698 (4th Cir. 2011). Those circumstances include the facts

known by the officers and the reasonable inferences warranted by those facts. *United States v. Hernandez-Mendez*, 626 F.3d 203, 207-08 (4th Cir. 2010).

Defendants' contend that three circumstances amounted to the presence of sufficient reasonable suspicion for Diaz to detain Plaintiff, even if he did not actually exert the requisite authority to actually do so: 1) "the alarming 911 report of children being put into the trunk of a vehicle by a yelling man; 2) the fact that the reported vehicle was registered to Plaintiff's address; and 3) Plaintiff's behavior towards police in response to Sgt. Diaz's arrival and communication." Def. Memo., pp. 18-19. While even this recitation of facts probably does not provide a showing sufficient to support an investigative detention, Defendants have omitted several relevant facts from each of the three considerations.

### 1. The Emergency Call

"An anonymous tip alone seldom demonstrates the informant's basis of knowledge or veracity." *Florida v. J.L.*, 529 U.S. 266 (2000). Police officers are trained to treat anonymous callers for the possibility that they "often have limited, inaccurate, or missing information." **Ex. H (Report of Russ Hicks), 16.** Indeed, the "absence of accurate information does not provide specific, articulable facts and circumstances for officers to detain individuals that may or may not be involved in the 911 call." **Id.**

The initial call that described children "being put into the trunk of a vehicle" actually comes from the second-hand report of an individual relaying the information of an anonymous tipster. **Def. Ex. 1, 00:00:18-28.** After resolving the discrepancy between the car that this individual was told to follow as opposed to the car that was actually seen at the IHOP, Officer Moran corrected the report of the anonymous tipster to include only a report that someone had yelled at children and shut the door to a car. **Def. Ex. 1, 00:04:28-50.** Importantly, this first-hand

witness still chose to remain anonymous when providing this information to police. It was not until after Sgt. Diaz broke into the house that the first-hand witness's identity was provided to Officer Moran. **Ex. H, 6**-7.

### 2. *The Vehicle Registered to the Address*

Although the license plate number provided by the second-party caller matched a black Tesla with a registered address at Plaintiff's home, Defendants received two items of information reflecting the fact that the children had probably been sitting in rear-facing seats. ***See, e.g.,* Def. Ex. 1 at 00:02:40-47** ("Teslas have rear-facing seats in the trunk, so they might be able to sit there."); **Def. Ex. 1, 00:04:28-50** ("I have the original complainant here. He says that he was at the IHOP in Langley Park, that he saw the black male open the trunk, yell at the kids, and close the trunk, but like I said, they might have possible rear-facing seats in the trunk that are legal.").

### 3. *The Conversation at the Door*

Sgt. Diaz, who was the only officer present for the entirety of the conversation, described Plaintiff's demeanor as "respectful," **Ex. A, 133:21-134:16**, *c.f.* **Def. Ex. 2 (Report of Ofc. Min)** (describing Plaintiff as "yelling"). In composing an affidavit in support of his request for summary judgment, Sgt. Diaz describes Plaintiff as "defensive and evasive" and "show[ing] signs of deception," statements which need not be accepted at this procedural juncture. *U.S. Equal Emp. Opportunity Comm'n v. Ecology Servs., Inc.*, 447 F. Supp. 3d 420, 441 (D. Md. 2020) (affidavits that contradict a party's deposition testimony need not be credited on motion for summary judgment).

Furthermore, the Supreme Court has "consistently held that a refusal to cooperate, without more, does not furnish the minimal level of objective justification needed for a detention or seizure. See *Delgado, supra,* 466 U.S., at 216–217, 104 S.Ct., at 1762–1763; *Royer,* 460 U.S.,

at 498, 103 S.Ct., at 1324 (plurality opinion); *Brown v. Texas,* 443 U.S. 47, 52–53, 99 S.Ct. 2637, 2641–2642, 61 L.Ed.2d 357 (1979)"). *Fla. v. Bostick*, 501 U.S. 429, 437, 111 S. Ct. 2382, 2387, 115 L. Ed. 2d 389 (1991). Although Sgt. Diaz has testified that neither Plaintiff nor his wife were required to speak with him during the time they were talking on the porch, his stated basis for entering Plaintiff's house was Plaintiff's refusal to cooperate and answer questions. ***See Ex. A 141:6-147:9.***

To be sure, the refusal to cooperate may furnish reasonable suspicion with additional facts, neither of the other two bases stated by Sgt. Diaz amount to any particularized suspicion of criminal activity. In fact, one of them is a presumptively questionable anonymous tip reported through a second-hand caller that later turned out to be inaccurate, and the other affirmatively suggested that the child's father had placed them in legal rear-facing seats. These facts, coupled with the lack of any identifying information for either the children who had been placed in rear-facing seats or the person who had put them there, demonstrate only that someone saw a person yell at children in rear-facing seats and close the door. Plaintiff's discussion with Sgt. Diaz on the porch of his home, like the other items of information, provide no specific indication that Plaintiff himself was involved in criminal activity. Indeed, in the light most favorable to Plaintiff, someone saw a father discipline his children and *told somebody else* they should call 911; the incident was not significant enough for the person who witnessed it to call 911 themselves.

It is quite plain to see that no officer on the scene believed reasonable articulable suspicion existed to detain Plaintiff or his wife. First, Sgt. Diaz explicitly turned off his sirens before engaging Plaintiff in a voluntary conversation about the anonymous tip. **Def. Ex. 5.** Diaz did not approach the house with any weapons drawn, did not park his car in such a way to

indicate that the residents were not free to leave, nor did he make any objective manifestation that they were not free to go whatsoever. Second, Officer Min critically admitted that Defendants would not have entered Plaintiff's home if they knew Teslas had rear-facing seats. **Ex. B. 00:03:20-00:03:58.** Of course, the only information Defendants had on this question at the time indicated that they did in fact know this information. **Ex. A**, **100:7-15; 116:3-118:21.**

### C. There Was No Seizure Preventing Plaintiff From Entering His House.

Not only do Defendants acknowledge that Sgt. Diaz made no display of force or authority that would render a reasonable person to believe that they were not free to leave until Plaintiff entered his house, there is no indication whatsoever that Plaintiff did in fact feel that he could not terminate the encounter such that a *Terry* stop had in fact occurred during the conversation on the porch. *California v. Hodari D.*, 499 U.S. 621, 626, 111 S. Ct. 1547, 1548, 113 L. Ed. 2d 690 (1991) ("a Fourth Amendment seizure only occurs if the subject yields to an officers' outward displays of authority").

Put another way, "[A] person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *U.S.* v. *Mendenhall,* 446 U.S., at 554, 100 S.Ct., at 1877. *Mendenhall* sets forth a "*necessary,* but not a *sufficient,* condition for seizure," which is that some objectively determinable "show of authority" has been conveyed such that a reasonable person would not feel free to leave. *Hodari D.*, at 628.

There is no evidence in the record that Plaintiff felt that he was not free to leave; indeed, the cordial conversation he had with Sgt. Diaz before the forced entry indicates that he felt absolutely free to leave.

### D. There Was No Exigency Justifying Diaz and Min's Entry Into Plaintiff's Home.

Of course, if reasonable articulable suspicion did not exist, it is highly unlikely that facts suggesting an exigent circumstance existed in its absence. Defendants, however, rely on the same facts they claim created reasonable articulable suspicion to support Diaz's entry into the home under either the exigency or community caretaker exception to the warrant requirement. Both exceptions are inapplicable here.

Traditionally, exigent circumstances have been limited to situations wherein officers have information to suggest an individual's safety is in immediate danger, demonstrated by objective evidence of immediate emergency such as visible blood or wounds, the hot pursuit of a fleeing felon, or reason to believe the destruction of evidence is imminent. Defendants cite only to the premise that Sgt. Diaz was concerned that the health and safety of children were at issue, although they can point to no information as to who those children were, what role Plaintiff could have played in harming them, and what specific facts other than an anonymous 911 call, information that Teslas have rear-facing seats, and a cordial conversation between Plaintiff and Sgt. Diaz could possibly supply the basis for an exigency.

Defendants' brief overture to the community caretaking exception fares no better, for no officer had any description for the children they were supposedly going to check on. **Ex. F, 27.** Furthermore, it is beyond question that the community caretaking exception cannot apply in the home. *Caniglia v. Strom*, 593 U.S. __ (2021). In any event, the community care taking exception has always required officers to actually exercise their non-investigative powers in order to invoke the doctrine. Defendants' entry into the home here was clearly related to their faulty investigation of criminal activity.

**E. Use of Force Was Unjustified Given the Lack of Justification for Arrest.**

Evaluating the reasonableness of the officer's actions "requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham,* 490 U.S. at 396, 109 S.Ct. 1865 (internal quotation marks omitted). To properly consider the reasonableness of the force employed we must "view it in full context, with an eye toward the proportionality of the force in light of all the circumstances. *Smith v. Ray*, 781 F.3d 95, 101 (4th Cir. 2015). Ultimately, the question to be decided is "whether the totality of the circumstances justifie[s] a particular sort of ... seizure." *Tennessee v. Garner,* 471 U.S. 1, 8–9, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985).

Here, the only reason for force was because of Plaintiff's attempt to resist an arrest. If the arrest was unlawful, he has the right to resist it. "Importantly, if Defendant[s] had no right to be inside the home, then [they] had no right to use force.". Allotey v. Baltimore Cnty., Maryland, No. 1:21-CV-02288-JMC, 2022 WL 17105120, at *8 (D. Md. Nov. 22, 2022), appeal dismissed sub nom. Allotey v. Becketts, No. 22-2312, 2023 WL 4198891 (4th Cir. Jan. 11, 2023) (*citing Williams*, 9 F.4th at 440). Officer Lenhart has acknowledged the same in deposition. **Exh. E, 82.**

### F.  All of These Rights Were Clearly Established in 2017

As an initial matter, Plaintiff notes that Defendants are not entitled to qualified immunity for any of Plaintiff's claims brought under the Maryland Declaration of Rights. *Meyers v. Baltimore Cnty.*, 981 F. Supp. 2d 422, 430 (D. Md. 2013).

The basic rules of Section 1983 qualified immunity, however, are well known. Underlying the doctrine is a desire to avoid overdeterrence of energetic law enforcement by subjecting governmental actors to a high risk of liability. *Anderson v. Creighton,* 483 U.S. 635, 638, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987). The concerns behind the immunity defense are especially salient in the context of street-level police work, which frequently requires quick

and decisive action in the face of volatile and changing circumstances. The law thus shields police officers from civil liability unless the officer reasonably should have known that his actions violated clearly established constitutional rights. *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). *Rowland v. Perry*, 41 F.3d 167, 172 (4th Cir. 1994).

The reasonableness inquiry is an objective one. *Id.* To gauge objective reasonableness, a court examines only the actions at issue and measures them against what a reasonable police officer would do under the circumstances. *Graham v. Connor,* 490 U.S. 386, 397, 109 S.Ct. 1865, 1872, 104 L.Ed.2d 443 (1989). Subjective factors involving the officer's motives, intent, or propensities are not relevant. The objective nature of the inquiry is specifically intended to limit examination into an officer's subjective state of mind, and thereby enhance the chances of a speedy disposition of the case. *Rowland v. Perry*, 41 F.3d 167, 172–73 (4th Cir. 1994) (*citing Hunter v. Bryant,* 502 U.S. 224, 12 S.Ct. 534, 536–37, 116 L.Ed.2d 589 (1991)).

Though it focuses on the objective facts, the immunity inquiry must be filtered through the lens of the officer's perceptions at the time of the incident in question. *Sevigny v. Dicksey,* 846 F.2d 953, 957 (4th Cir.1988). Such a perspective serves two purposes. First, using the officer's perception of the facts at the time limits second-guessing the reasonableness of actions with the benefit of 20/20 hindsight. *Graham,* 490 U.S. at 396, 109 S.Ct. at 1871–72. Second, using this perspective limits the need for decision-makers to sort through conflicting versions of the "actual" facts, and allows them to focus instead on what the police officer reasonably perceived. *Gooden v. Howard County, Md.,* 954 F.2d 960, 965 (4th Cir.1992) (en banc). In sum, the officer's subjective state of mind is not relevant to the qualified immunity inquiry but his

perceptions of the objective facts of the incident in question are. *Rowland v. Perry*, 41 F.3d 167, 173 (4th Cir. 1994)

In terms that apply equally to seizures of property and to seizures of persons, the Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant. *Payton v. New York*, 445 U.S. 573, 590, 100 S. Ct. 1371, 1382, 63 L. Ed. 2d 639 (1980). It is axiomatic that the "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." *United States v. United States District Court*, 407 U.S. 297, 313, 92 S.Ct. 2125, 2134, 32 L.Ed.2d 752 (1972). For this reason, "searches and seizures inside a home without a warrant are presumptively unreasonable." *Payton v. New York*, 445 U.S., at 586, 100 S.Ct., at 1380; *see also Coolidge v. New Hampshire*, 403 U.S. 443, 474–475, 91 S.Ct. 2022, 2042–2043, 29 L.Ed.2d 564 (1971) ("a search or seizure carried out on a suspect's premises without a warrant is per se unreasonable, unless the police can show ... the presence of 'exigent circumstances' ").

Defendants cannot abrogate decades of precedent on warrantless entry to citizens' homes with a novel argument that *Terry* stops are in fact an undelineated exception to the Fourth Amendment's warrant requirement. Indeed, their interpretation of reasonable articulable suspicion would eviscerate the Supreme Court's meticulous determination of the boundaries of the Fourth Amendment and its requirement of probable cause *and* a warrant or an exception before entering a citizen's home.

The Supreme Court has emphasized that exceptions to the warrant requirement are "few in number and carefully delineated," *United States v. United States District Court*, , 407 U.S., at 318, 92 S.Ct., at 2137, and that the police bear a heavy burden when attempting to demonstrate an urgent need that might justify warrantless searches or arrests. Indeed, the Court has

recognized only a few such emergency conditions, see, e.g., *United States v. Santana*, 427 U.S. 38, 42–43, 96 S.Ct. 2406, 2409–2410, 49 L.Ed.2d 300 (1976) (hot pursuit of a fleeing felon); *Warden v. Hayden*, 387 U.S. 294, 298–299, 87 S.Ct. 1642, 1645–1646, 18 L.Ed.2d 782 (1967) (same); *Schmerber v. California*, 384 U.S. 757, 770–771, 86 S.Ct. 1826, 1835–1836, 16 L.Ed.2d 908 (1966) (destruction of evidence); *Michigan v. Tyler*, 436 U.S. 499, 509, 98 S.Ct. 1942, 1949, 56 L.Ed.2d 486 (1978) (ongoing fire), and has actually applied only the "hot pursuit" doctrine to arrests in the home, see *Santana*, supra.

### G. Monell Survives.

Defendants' arguments in support of their request for summary judgment on the *Monell* cause of action are derivative of their earlier arguments. If these claims survive, Defendants also acknowledge that *Monell* survives because of the possibility of a jury's finding of an individual violation.

### H. Monell Survives Even if All Individual Defendants Are Entitled To Qualified Immunity.

Even if the individual defendants are protected by qualified immunity, the *Monell* claim survives. "[T]here are some narrow circumstances in which "a finding of no liability on the part of the individual municipal actors can co-exist with a finding of liability on the part of the municipality." *Int'l Ground Transp., Inc. v. Mayor and City Council of Ocean City*, 475 F.3d 214, 219 (4th Cir. 2007). One such situation is when the individual defendants are entitled to qualified immunity. *Id.* However, to prevail on his *Monell* claim plaintiff still needs to prove that his constitutional rights were violated, regardless of whether the Officers are entitled to qualified immunity. *See Young*, 238 F.3d at 579." *Johnson v. Baltimore Police Dep't*, 500 F. Supp. 3d 454, 463 (D. Md. 2020)

**I. Defendants Diaz and Min's State of Mind Renders Punitive Damages Available.**

A jury may assess punitive damages in a Section 1983 action when the defendant's conduct was motivated by "evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Smith v. Wade,* 461 U.S. 30, 56, 103 S.Ct. 1625, 1640, 75 L.Ed.2d 632 (1983 ); *Cain v. Rock*, 67 F. Supp. 2d 544, 553–54 (D. Md. 1999) ("the Court cannot preclude the trier of fact from awarding punitive damages if that state of mind is established at trial.").

Punitive damages are available in the event there is evidence to demonstrate that the defendant acted with a guilty state of mind. Diaz filed a CPS report after acknowledging that his investigation revealed no information suggesting children were in danger. Min acknowledged that they would not have entered Plaintiff's house if they knew he had a Tesla, and that she "wasn't rich like [Plaintiff]." In addition, Officer Min authored a report which described Plaintiff in terms that are clearly false when viewed in light of the body camera footage captured by officers at the scene. For these reasons, there is ample evidence to support a claim for punitive damages at trial.

**IV.    Conclusion**

For the foregoing reasons, Plaintiff opposes Defendants' Motion for Summary Judgment. Viewed in the light most favorable to the non-moving party, there is no question that Officer Diaz had no reasonable articulable suspicion.

Respectfully submitted,

/s/ Masai McDougall          /s/
Law Office of Masai McDougall

P.O. Box 5835
Takoma Park, MD 20912
masaimcd@masailaw.com
(202) 361-9328 (cellular)