**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| FAREED NASSOR HAYAT, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| | )  Civil Action No. 20-cv-02994-LKG |
| v. | ) |
| | )  Dated:  February 12, 2025 |
| SGT. CASEY DIAZ, *et al.*, | ) |
| | ) |
| Defendants. | ) |
| | ) |

**MEMORANDUM OPINION**

## I.    INTRODUCTION

In this civil rights action, the Plaintiff, Fareed Nassor Hayat, alleges that the Defendants violated his rights under the Fourth Amendment, 42 U.S.C. § 1983 and Maryland law, during a police investigation into a reported kidnapping that occurred on October 22, 2017.  *See generally* ECF No. 19.  The Defendants have moved for summary judgment on the Plaintiff's claims, pursuant to Fed. R. Civ. P. 56.  ECF Nos. 78 and 78-1.  The motion is fully briefed.  ECF Nos. 78, 78-1, 84 and 92.  No hearing is necessary to resolve the motion.  *See* L.R. 105.6 (D. Md. 2021).  For the reasons that follow, the Court **GRANTS** the Defendants' motion for summary judgment and **DISMISSES** the complaint.

## II.    FACTUAL AND PROCEDURAL BACKGROUND[1]

### A.    Factual Background

In the remaining claims in this civil action, the Plaintiff alleges the Defendants violated Section 1983, the Fourth Amendment and Articles 24 and 26 of the Maryland Declaration of Rights, during a police investigation of a reported kidnapping that occurred at his residence on October 22, 2017.  *See generally* ECF No. 19; ECF No. 35.[2]  The Plaintiff seeks to recover,

---

[1] The facts recited in this memorandum opinion are taken from the amended complaint, the Defendants' motion for summary judgment, the memorandum in support thereof and the exhibits attached thereto, and the Plaintiff's response in opposition to the Defendants' motion.  ECF Nos. 19, 78, 78-1 – 78-18 and 84.

[2] After the Defendants filed a partial motion to dismiss the amended complaint (ECF No. 32), the Court entered an Order dismissing: (a) Counts I (Battery), II (Trespass), III (False Imprisonment), VI

among other things, compensatory damages, punitive damages and attorney's fees and costs from the Defendants.  *Id.* at Prayer for Relief.

The Parties

The Plaintiff is a resident of Montgomery County, Maryland and a law professor at Howard University.  ECF No. 19 at ¶ 4.

The Defendants are: (1) Montgomery County Police Department Officers, Sergeant Casey Diaz, and Officers Brooke Dolan, Nathan Lenhart and Nicole Min (the "Defendant Officers"); ten unnamed Doe Defendant Officers of the Montgomery County Police Department (the "Doe Defendants"); Marcus Jones, the Chief of the Montgomery County Police Department; and Montgomery County, Maryland (the "County").  *Id.* at ¶¶ 5-11.

The facts regarding the October 22, 2017, Incident are largely undisputed and set forth below.

The Kidnapping Report

On October 22, 2017, at 8:09 p.m., the Emergency Communications Center ("ECC") issued a priority call over the radio to Montgomery County Police Department ("MCPD") Officers for the kidnapping of children outside of an IHOP located in Silver Spring, Maryland.  ECF No. 78-3 (Defs. Ex. 1, Emergency Communications Center Radio Transmission); ECF No. 78-4 (Defs. Ex. 2, Excerpts of Incident Report and CAD Report, MC008).  The ECC dispatcher advised the MCPD Officers to "respond priority for a kidnapping" in the area of Piney Branch Road and University Blvd.  ECF No. 78-3 at 00:00:18-28.  ECC also advised that the "complainant was

---

(Violation of 14th Amendment Right to Familial Privacy) and VII (Violation of Property Rights) in their entirety; (b) any 14th Amendment claim raised in Count IV; (c) All official capacity claims with respect to Sgt. Diaz, Ofc. Dolan, Ofc. Min, and Ofc. Lenhart; and (d) Claims for monetary relief of any kind in their official capacities against Sgt. Diaz, Ofc. Dolan, Ofc. Min, Ofc. Lenhart, and Chief Marcus Jones, and the County.  *See* ECF No. 35.  The claims which remain are: (a) Count IV, Violation of Fourth Amendment Rights - 42 U.S.C. § 1983, against Sgt. Diaz (individual capacity), Ofc. Dolan (individual capacity), Ofc. Min (individual capacity), Ofc. Lenhart (individual capacity), Chief Jones (official capacity), Montgomery County, and Does 1-10; and (b) Count V, Violation of MD. Decl. of Rights Articles 24 and 26, against Sgt. Diaz (individual capacity), Ofc. Min (individual capacity), Ofc. Dolan (individual capacity), Ofc. Lenhart (individual capacity), Montgomery County, and Does 1-10.  *Id.*  The Court bifurcated Plaintiff's *Monell* Claim against the County and Chief Jones in Count IV of the Amended Complaint for discovery and trial.  ECF No. 51.

told by another driver that he saw someone grab three children and put them in the trunk of a vehicle." *Id.* at 00:00:29-36. And so, the ECC then provided a description of the vehicle of the suspect, stating, "A suspect vehicle, black, [license plate number], driven by a black male, northbound university towards Wheaton, unknown location in route." *Id.* at 00:01:19-32.

MCPD Sergeant Robert Sheehan reported over air that "the car comes back to a 2013 Tesla, to a black male, 1 Eastmoor Drive in Silver Spring." *Id.* at 00:02:03-10. No other information was provided regarding the owner of the vehicle at this time. *Id.* MCPD Officer Moran also stated over air that: "Teslas have rear-facing seats in the trunk, so they might be able to sit there." *Id.* at 00:02:40-47.

The information regarding the alleged kidnapping was provided to 911 by a second party caller who identified himself as "Luis," and said that he was relaying information from the original complainant, who was later identified as Edgar Ayala Solano. ECF No. 78-3 at 1: 45:00; ECF No. 78-4. While the license plate provided by "Luis" was matched to a black Tesla registered to an address of 1 Eastmoor Drive in Silver Spring, MD, the car that "Luis" was following was actually a white Range Rover. ECF No. 78-3 at 2:34:00. The caller to 911 provided no identifying information for the three children and no identifying information for the suspect other than that he was a black male. *Id*. at 00:01:19-32.

Shortly after the initiation of the call, Officer Moran advised that he had made in-person contact with the original complainant:

> Edgar original complainant here. He says that he was at the IHOP in Langley Park, that he saw the black male open the trunk, yell at the kids, and close the trunk, but like I said, they might have possible rear-facing seats in the trunk that are legal.

*Id.* at 00:04:28-50. Mr. Ayala Solano also told Officer Moran that he observed the suspect "tie up the children." ECF No. 78-5 (Defs. Ex. 3, Deposition Transcript of Officer Jorge Moran) at 12:18.

MCPD officers were dispatched priority to 1 Eastmoor Drive, Silver Spring, Maryland ("the Residence") in response to the 911 call. ECF No. 78-4 at 1. This address was associated with the registered owner of the vehicle, based upon the license plate number recorded by Mr. Ayala Solano, who had seen three children put into the trunk of the vehicle. ECF No. 78-3.

<u>The Initial Investigation</u>

Sergeant Diaz arrived first on scene at the Residence. ECF No. 78-7 (Defs. Ex. 5,

Affidavit of Sergeant Casey Diaz) at ¶ 9.  At the time of the October 22, 2017, Incident, Sergeant Diaz had 12 years of experience, and in addition to serving as a patrol officer, he had served on the Special Assignment Team in a plainclothes investigative unit and on the Special Investigations Division, specializing in drug trafficking.  *Id*. at ¶¶ 5 and 6.  Sergeant Diaz had also received specialized training in conducting interviews and interrogations, including the signs of deception, and had conducted over 200 interviews as a patrol officer and in special assignments.  *Id*. at ¶ 6.

Sergeant Diaz responded to the Residence with his police cruiser lights and sirens on but he turned off the police cruiser's lights and sirens before approaching the Residence to avoid alerting the subjects of the police presence.  *Id*. at ¶ 9.  After Sergeant Diaz parked his police cruiser, he began to walk up the driveway of the Residence and he immediately observed an unknown black male and female, later identified as the Plaintiff and his then wife, Norrinda Hayat, standing on the steps outside of the Residence.  *Id*. at ¶ 10.

Sergeant Diaz believed that the male subject matched the limited description of the subject provided by the 911 caller.  *Id*. at ¶ 11.  Sergeant Diaz also observed that the individuals standing outside of the Residence did not appear surprised by his arrival, and appeared to have anticipated his arrival on scene.  *Id*. at ¶ 12.

Based on his knowledge, training and experience, and given that the residents of the household had not themselves requested police assistance, Sergeant Diaz found it suspicious, that the individuals were standing outside of the residence, not engaging in any other activity, apparently anticipating the police arrival.  *Id*.  Sergeant Diaz found this especially suspicious because he did not announce his arrival with the lights and sirens from his police cruiser.  *Id*. And so, Sergeant Diaz suspected that the individuals may have knowledge regarding the reported kidnapping and/or that they were attempting to conceal activity within the household. *Id*. at ¶ 12; *see also* ECF No. 78-8 at 142:18-20 (Defs. Ex. 6, Deposition Transcript of Sergeant Casey Diaz).

Sergeant Diaz approached the Plaintiff and his former wife, and then the following exchange occurred as captured on his body worn camera:

**Sgt. Diaz:** "Hi, how are you doing? Everything okay here?"

**Plaintiff:** [indiscernible]

**Sgt. Diaz:** "Were you guys just at the IHOP down in Langley Park?"

**Plaintiff:** "What's the problem?"

**Sgt. Diaz:** "We got a call of a kidnapping, or something like that, were you guys down at the IHOP?"

**Plaintiff:** "There is no kidnapping here, sir."

**Sgt. Diaz:** "What's that?"

**Plaintiff**: "There is no kidnapping here, sir."

**Sgt. Diaz:** "Okay, well I just need to make sure everybody is ok."

**Plaintiff:** "Okay…how are you going to do that?"

**Sgt. Diaz:** "Well, we are talking. We are talking."

**Plaintiff:** "Everything is ok here."

**Sgt. Diaz:** "Well, I need to check. Are there any kids here?"

**Plaintiff:** "Yes."

**Sgt. Diaz:** "Okay. Well, can we see them?"

**Plaintiff:** "You cannot come into our house. We are both lawyers. I am a professor at the University of Howard, she is a professor at UDC. This is our home. You do not have a warrant. You are not coming in our home."

[Overheard in the background] **Mrs. Hayat**: "I am a professor of law."

**Sgt. Diaz:** "Can you come down here for a second?"

**Plaintiff:** "I cannot."

**Mrs. Hayat:** "Can you explain to us what is going on here?"

**Sgt. Diaz:** "Yeah, somebody saw something involving some kids at an IHOP. . . "

ECF No. 78-9 (Defs. Ex. 7, Sergeant Casey Diaz's Body Worn Camera Footage) at 00:00:38 – 00:01:47.  After this exchange, the Plaintiff cut off the conversation between Sergeant Diaz and Mrs. Hayat, put his arm on Mrs. Hayat, ushered her into the Residence, and shut the door, while saying, "Norrinda, walk into our home please.  Walk into our home.  If you would like to come into our home without a warrant. . ." *Id.*

The Entry Into The Residence

The Plaintiff attempted to end the  investigation  and  close the door to the Residence.  ECF No. 78-4 at 1.  The Plaintiff also stated that the Officers needed a warrant to enter the Residence.  *Id*.

Sergeant  Diaz attempted to prevent the Plaintiff from shutting the door and gave commands for the Plaintiff to open the door.  ECF No. 78-4 at 1; 78-7 at ¶ 20.

Officer Min, who had arrived at the scene,  assisted  Sergeant  Diaz in attempting  to open the door to the Residence and both Officers commanded Plaintiff to "open the door."  ECF No. 78-9 at 00:01:41-00:01:47.  The Plaintiff physically resisted by pushing back against the door, while yelling "you are not allowed in our house."  *Id.*

In this regard, Sergeant Diaz states in his sworn Affidavit that, based on his knowledge, training, and experience, he found it suspicious that the Plaintiff stopped Mrs. Hayat from speaking about the incident and ushered her back inside the Residence.  *See* ECF No. 78-7; *see also* ECF No. 78-8 at 146:3-9.  In this regard, Sergeant Diaz testified during his deposition, that he believed Mrs. Hayat could have had information as to what occurred at the IHOP, or as to the welfare of the children.  *See* ECF No. 78-8 at 146:3-9.

Sergeant Diaz also states in his sworn Affidavit that, based on his knowledge, training, and experience, he believed that the Plaintiff's responses to his questions were evasive and showed signs of deception, because the Plaintiff never acknowledged whether or not he had been at the IHOP.  ECF No. 78-7 at ¶ 17.  In this regard, Sergeant Diaz states that, after he told the Plaintiff that he was investigating a reported kidnapping at the IHOP, the Plaintiff did not act surprised or deny that he had been at the IHOP, but instead avoided the question, answering, "there is no kidnapping here."  *Id.*  Given this, Sergeant Diaz believed that the Plaintiff was using his background as a law professor as a deflection to Sergeant Diaz's questions.  *Id.*

Sergeant Diaz also found it suspicious that the Plaintiff seemed particularly concerned about Mrs. Hayat learning details of the kidnapping report that he was trying to share with her.

*Id.* And so, Sergeant Diaz believed that the Plaintiff's demeanor was defensive and evasive throughout the encounter, given Plaintiff's posture, body language and tone of voice. *Id.*

Sergeant Diaz also states in his sworn Affidavit that the Plaintiff became even more defensive, by stating that he and Mrs. Hayat were attorneys, and that the Plaintiff also told Sergeant Diaz that he could not enter the Residence, even though he had not attempted or requested to do so. *Id.* at ¶ 18. In addition, Sergeant Diaz states in his sworn Affidavit that the Plaintiff became even more agitated when Mrs. Hayat asked Sergeant Diaz to explain what was going on. *Id.* at ¶ 19.

In his regard, Sergeant Diaz states that, when he began to provide this information to Mrs. Hayat, the Plaintiff abruptly ushered Mrs. Hayat back into the Residence and ended the communication. *Id.* And so, Sergeant Diaz contends that the Plaintiff's conduct prevented him from informing Mrs. Hayat about the details of the reported kidnapping and prevented Mrs. Hayat from sharing information she may have had that was relevant to this critical, ongoing investigation. *Id.* Sergeant Diaz states in his sworn Affidavit that, based on his knowledge, training, and experience, the information he received regarding the reported kidnapping, the Plaintiff's comments and behavior, the totality of these observations and the information known to him at that time, which included the ECC transmissions, he believed that children were inside of the Residence who were in immediate threat of serious danger. *Id.* at ¶ 20.

<u>The Use Of Force On The Plaintiff</u>

Sergeant Diaz and Officer Min ultimately succeeded in gaining entry to the Residence. ECF No. 78-11 (Def. Ex. 9, Officer Nathan Lenhart's Body Worn Camera Footage) at 00:00:00 – 00:00:20.[3] Once the Officers were inside the Residence, the Plaintiff yelled at them repeatedly, screaming that he was an attorney and that they could not be in his home. *Id.* The Officers gave commands to the Plaintiff to handcuff him. *Id.* But, the Plaintiff resisted the Officers' efforts to gain control of his arms and to handcuff him. *See* ECF No. 78-12 (Defs. Ex. 10, Deposition Transcript of Officer Nicole Min) at 77:1-2 and 78:13-79:4; ECF No. 78-11.

Officer Lenhart, who arrived on scene after the entry by Sergeant Diaz and Officer Min, testified during his deposition that he heard a loud commotion from the driveway, which

---

[3] Officer Dolan entered the Residence after Sergeant Diaz and Officer Min and she did not at any time touch or speak with the Plaintiff. ECF No. 78-15 (Defs. Ex. 13).

prompted him to run up to the Residence. ECF No. 78-13 (Defs. Ex. 11, Deposition Transcript of Officer Nathan Lenhart) at 46:20-47:1; *see also* ECF No. 78-14 (Defs. Ex. 12, Affidavit of Officer Nathan Lenhart) at ¶ 8.

During his deposition, Officer Lenhart also testified that he knew that the police were responding to a reported kidnapping and heard Officers stating, "put your hands behind your back" and "get on the ground" to a male subject who was actively resisting and refusing to comply with the Officers' orders. ECF No. 78-13 at 47:2-9, 56:8-20. In this regard, Officer Lenhart states in his sworn Affidavit that he observed that Officer Min and Sergeant Diaz were both smaller than the Plaintiff, and that Officer Min and Sergeant Diaz were unable to gain Plaintiff's compliance with their orders for him to place his hands behind his back. ECF No. 78-14 at ¶ 10. Officer Lenhart also states that he observed that the Plaintiff was not giving up his hands to be handcuffed, and was not placing his hands behind his back, or getting on the ground as ordered. *Id.* And so, Officer Lenhart further states that, he, Sergeant Diaz and Officer Min brought the Plaintiff to the ground from a standing position to place him in handcuffs, given the Plaintiff's non-compliance and active resistance. *Id.* at ¶ 12.

In this regard, Officer Lenhart testified that he grabbed the Plaintiff from his upper torso, guided him to the ground, and in the prone position on the ground, maintained control of his upper arms to attempt to handcuff him. ECF No. 78-13 at 58:6-8, 61:1-7. Lastly, Officer Lenhart states in his sworn Affidavit that he employed control techniques from his knowledge, training, and experience as an officer, to physically restrain the Plaintiff, while minimizing the potential for injury to both the Plaintiff and Officers. *See* ECF No. 78-14 at ¶ 13.

The video evidence from police-worn body camera footage shows that the Plaintiff repeatedly screamed "you cannot do this in our home," and "we are both law professors," while the Officers attempted to handcuff him. ECF No. 78-11 at 00:00:15-26, 00:00:26-32. The video evidence also shows that Sergeant Diaz repeatedly told the Plaintiff to "put your hands behind your back." *Id.* at 00:00:27-35. It is undisputed that no strikes, hits, punches, kicks, or weapons were used against the Plaintiff during the October 22, 2017, Incident. ECF Nos. 78-7; 78-10, 78-14, 78-15 (Affidavit of Officer Brooke Dolan Kyriacou) and 84.

After the Plaintiff was handcuffed, he was taken to a kneeling position on the floor, with Sergeant Diaz and Officer Lenhart located next to him and with their hands on him. ECF No.

78-17 (Defs. Ex. 15, Body Worn Camera Footage 1700769290_1_Eastmoor_Drive) at 00:01:22. Officer Lenhart cleared a spot on the bench in the foyer and said to the Plaintiff, "Sir, why don't you have a seat right here." ECF No. 78-16 (Defs. Ex. 14, Officer Nathan Lenhart's Body Worn Camera Footage, Part II) at 00:02:39. Once the Officers believed that the Plaintiff had calmed down, he was unhandcuffed. ECF No. 78-17 at 00:09:37.

Thereafter, the Plaintiff requested an ambulance. *Id.* at 00:12:16. EMS arrived and examined Plaintiff. *Id.* at 00:20:52. The Plaintiff declined any medical treatment and stated that "I don't believe I need to go to the hospital." *Id.* at 00:21:27.

<u>The Completion Of The Investigation</u>

Thereafter, the Plaintiff's brother arrived at the scene and he provided the children's names, and he confirmed that he had just seen one of the children inside the home. ECF No. 78-18 at 00:01:30-00:02:09. Mrs. Hayat also confirmed that the Plaintiff and her children had been at the IHOP and showed the Officers the children. *Id.* at 00:02:55-00:05:10 and 00:04:51. An Officer indicated that he had been allowed to briefly observe the children and that they appeared okay. *Id.* at 00:02:58. And so, the MCPD determined that a kidnapping had not occurred and the Officers left the scene.[4] ECF No. 78-7.

### B.    Procedural Background

The Plaintiff commenced this civil rights action on October 15, 2020. ECF No. 1. On February 17, 2021, the Plaintiff filed an amended complaint. ECF No. 19.

After the Defendants filed a motion to partially dismiss the amended complaint, pursuant to Fed. R. Civ. P. 12(b)(6), the Court issued a memorandum opinion and order dismissing Counts I (Battery), II (Trespass), III (False Imprisonment), VI (Violation of 14th Amendment Right to Familial Privacy) and VII (Violation of Property Rights) in their entirety; any 14th Amendment claim raised in Count IV; all official capacity claims with respect to Sergeant Diaz, Officer Dolan, Officer Min and Officer Lenhart; and claims for monetary relief against the County and the Defendant Officers in their individual capacities. ECF No. 35. On November 30, 2022, the

---

[4] Sergeant Diaz testified that he filed a report with Maryland Child Protective Services, because he thought "it was significant enough that there was, you know, an incident at the IHOP that somebody was able to interpret as a kidnapping." ECF No. 78-8 at 182:3-5.

Court bifurcated Plaintiff's *Monell* claim against the County and Chief Jones for discovery and trial.  ECF No. 51.

On July 24, 2024, the Defendants filed a motion for summary judgment, pursuant to Fed. R. Civ. P. 56, and a memorandum in support thereof.  ECF No. 78 and 78-1.  On September 6, 2024, the Plaintiff filed a response in opposition the Defendants' motion.  ECF No. 84.  On October 15, 2024, the Defendants filed a reply brief.  ECF No. 92.

The Defendants' motion for summary judgment having been fully briefed, the Court resolves the pending motion.

## III.    LEGAL STANDARDS

### A.    Rule 56

A motion for summary judgment filed pursuant to Fed. R. Civ. P. 56 will be granted only if there exists no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  And so, if there clearly exist factual issues "that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party," then summary judgment is inappropriate. *Anderson*, 477 U.S. at 250; *see also Pulliam Inv. Co., Inc. v. Cameo Props.*, 810 F.2d 1282, 1286 (4th Cir. 1987); *Morrison v. Nissan Motor Co., Ltd.*, 601 F.2d 139, 141 (4th Cir. 1979).

When ruling on a motion for summary judgment, the Court must construe the facts alleged in the light most favorable to the party opposing the motion.  *See United States v. Diebold*, 369 U.S. 654, 655 (1962); *Gill v. Rollins Protective Servs. Co*., 773 F.2d 592, 595 (4th Cir. 1985).  In this regard, the moving party bears the burden of showing that there is no genuine issue as to any material fact and that the party is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(c); *Catawba Indian Tribe of S.C. v. State of S.C.*, 978 F.2d 1334, 1339 (4th Cir. 1992), *cert. denied,* 507 U.S. 972 (1993).  But, a party who bears the burden of proof on a particular claim must also factually support each element of his or her claim.  *See Celotex Corp.*, 477 U.S. at 322-23.  Given this, "a complete failure of proof concerning an essential element . . . necessarily renders all other facts immaterial."  *Id.* at 323.  And so, on those issues on which the nonmoving party will have the burden of proof, it is the nonmoving party's responsibility to confront the motion for summary judgment with an affidavit or other similar evidence in order to show the existence of a genuine issue for trial.  *See Anderson*, 477 U.S. at 256.

In this regard, the United States Court of Appeals for the Fourth Circuit has held that, "[a] mere scintilla of evidence in support of the nonmovant's position will not defeat a motion for summary judgment." *Detrick v. Panalpina, Inc*., 108 F.3d 529, 536 (4th Cir. 1997). And so, there must be "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (internal citations omitted).

### B.   *Monell* Claims

Title 42, United States Code, section 1983 provides a mechanism for individuals who have had their constitutional rights violated to seek a remedy against individual state actors. *See* 42 U.S.C. § 1983 (providing that if any person acting "under color of any statute, ordinance, regulation, custom, or usage, of any State" deprives a United States citizen of any constitutional right, that person may be liable in a suit for money damages). Section 1983 permits a plaintiff to bring a claim directly against a municipality if the municipality causes a deprivation of a constitutional right through an official policy or custom. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978). But, "a municipality can be found liable under § 1983 only where the municipality *itself* causes the constitutional violation at issue." *City of Canton v. Harris*, 489 U.S. 378, 385 (1989) (emphasis in original).

Given this, a local government, such as the County, "may not be sued under § 1983 for an injury inflicted solely by its employees or agents." *Monell*, 436 U.S. at 694. And so, the United States Supreme Court has held that a municipality may be liable under § 1983 "when a municipality's policy or custom has caused the violation of an individual's federal rights." *Gonzaga Univ. v. Doe*, 536 U.S. 273, 296 (2002) (J. Stevens, dissenting).

A *Monell* plaintiff need only meet the basic "short and plain statement" requirement of Fed. R. Civ. P. 8(a) in the complaint. *Leatherman v. Tarrant Cty. Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 168-69 (1993). But, the United States Court of Appeals for the Fourth Circuit has held that a *Monell* plaintiff must adequately plead "the existence of an official policy or custom that is fairly attributable to the municipality and that proximately caused the deprivation of their rights." *Jordan ex rel. Jordan v. Jackson*, 15 F.3d 333, 338 (4th Cir. 1994). The Fourth Circuit has also held that "a municipal policy or custom giving rise to § 1983 liability will not be inferred merely from municipal inaction in the face of isolated constitutional deprivations by municipal employees." *Milligan v. City of Newport News*, 743 F.2d 227, 230

(4th Cir. 1984). And so, the municipality's conduct must demonstrate "deliberate indifference to the rights of potentially affected citizens," in order for conduct to be properly thought of as a "policy." *Jones v. Wellham*, 104 F.3d 620, 626 (4th Cir. 1997).

In this regard, the Fourth Circuit has held that a plaintiff can demonstrate the existence of a policy or custom for which a municipality may be liable in four ways: "(1) through an express policy, such as a written ordinance or regulation; (2) through the decisions of a person with final policymaking authority; (3) through an omission, such as a failure to properly train officers, that manifest[s] deliberate indifference to the rights of citizens; or (4) through a practice that is so 'persistent and widespread' as to constitute a custom or usage with the force of law." *Lytle v. Doyle*, 326 F.3d 463, 471 (4th Cir. 2003) (citation omitted) (brackets in original).[5] This Court has also held that "[a] plaintiff must allege numerous particular instances of unconstitutional conduct in order to establish a custom or practice, because 'a municipality is not liable for mere isolated incidents of unconstitutional conduct by subordinate employees.'" *Weeden v. Prince George's Cty.*, No. 17-2013, 2018 WL 2694441, at *4 (D. Md. June 4, 2018) (quoting *Smith v. Ray*, 409 F. App'x. 641, 651 (4th Cir. 2011); *see also Talley v. Anne Arundel Cty.*, No. 21-347, 2021 WL 4244759, at *14 (D. Md. Sept. 17, 2021) ("Alleging such a [persistent and widespread] practice requires a plaintiff to plead prior instances of similar conduct."). Lastly, "a jury may be permitted to assess punitive damages in an action under § 1983 when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Smith v. Wade*, 461 U.S. 30, 56 (1983).

---

[5] "Under a *Monell* condonation theory of liability, a municipality is liable if its policymakers fail "'to put a stop to or correct a widespread pattern of unconstitutional conduct.'" *Cottman v. Balt. Police Dep't*, No. 21-837, 2022 WL 137735, at *6 (D. Md. Jan. 13, 2022) (quoting *Owens v. Balt. City State's Attorney's Office*, 767 F.3d 379, 402 (4th Cir. 2014)). To state a claim for liability under this theory, a plaintiff must point to: "'[A] persistent and widespread practice[] of municipal officials,' the 'duration and frequency' of which indicate that policymakers (1) had actual or constructive knowledge of the conduct, and (2) failed to correct it due to their 'deliberate indifference.' Both knowledge and indifference can be inferred from the 'extent' of employees' misconduct. Sporadic or isolated violations of rights will not give rise to *Monell* liability; only 'widespread or flagrant' violations will." *Owens*, 767 F.3d at 402-03 (internal citations omitted) (quoting *Spell v. McDaniel*, 824 F.2d 1380, 1390 (4th Cir. 1987)).

### C.    Fourth Amendment Claims Search And Seizure

The Fourth Amendment protects "[t]he right of the people to be secure in their persons . . . . against unreasonable . . . seizures." U.S. Const. amend. IV. In this regard, the Supreme Court held that a seizure requires either physical force to restrain movement or, where that is absent, submission by the subject to the assertion of authority by the police officer. *California v. Hodari D.*, 499 U.S. 621, 626 (1991). The Fourth Circuit has also held that an officer's show of authority occurs when an individual would not feel free to leave, and that the individual's view should be measured objectively from an innocent person's perspective. *United States v. Cloud*, 994 F.3d 233, 242 (4th Cir. 2021).[6]

Relevant to the pending motion, an officer must have reasonable articulable suspicion of criminal activity to detain an individual pursuant to a *Terry* stop. *United States v. Johnson*, 599 F.3d 339, 345 (4th Cir. 2010). Reasonable suspicion is suspicion based on "specific and articulable facts . . . taken together with rational inferences from those facts[.]" *Terry v. Ohio*, 392 U.S. 1, 21 (1968). This is an objective standard that examines the reasonableness of police action based on the facts available to the officer at the time of the seizure. *Id.* at 21-22. And so, "[t]he Fourth Amendment requires 'some minimal level of objective justification' for making the stop." *United States v. Sokolow*, 490 U.S. 1, 7 (1989). Because "that level of suspicion is considerably less than proof of wrongdoing by a preponderance of the evidence," "the level of suspicion required for a *Terry* stop is obviously less demanding than that for probable cause[.]" *Id.*

The Fourth Circuit has also recognized that a person cannot avoid a *Terry* stop simply by retreating into a home. *See Rivera v. Washington*, 57 Fed. App'x 558, 562 (4th Cir. 2003) ("courts have recognized that a person cannot avoid a *Terry* stop simply by retreating into a home") (collecting cases). Courts in this this Circuit have recognized that the necessary elements to detain an individual pursuant to a *Terry* stop, where a suspect retreats into the home, are: (1) encountering a suspect outside a home; and (2) officers having reasonable articulable suspicion of criminal activity prior to detainment. *See Allotey v. Baltimore Cnty., Maryland*,

---

[6] The Court applies the same analysis employed for claims under the Fourth Amendment to the United States Constitution for claims brought under Articles 24 and 26 of the Maryland Constitution. *Williams v. Prince George's Cty.*, 685 A.2d 884, 895 (Md. Ct. Spec. App. 1996).

No. 1:21-CV-02288-JMC, 2022 WL 17105120, at *6 (D. Md. Nov. 22, 2022); *Harbin v. City of Alexandria*, 712 F. Supp. 67, 71-72 (E.D. Va. 1989), *aff'd*, 908 F.2d 967 (4th Cir. 1990); *see also Edwards v. United States*, 364 A.2d 1209, 1214 (D.C. 1976).

In addition, the Supreme Court has held that "law enforcement officers may enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury." *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006). Given this, "'[t]he need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency.'" *Id.* (quoting *Mincey v. Arizona*, 437 U.S. 385, 392 (1978)). But law enforcement must have "an objectively reasonable basis for believing that an occupant is seriously injured or imminently threatened with such injury." *Id.* at 400. Law enforcement "action is 'reasonable' under the Fourth Amendment, regardless of the individual officer's state of mind, 'as long as the circumstances, viewed objectively, justify [the] action.'" *Id.* at 404 (quoting *Scott v. United States,* 436 U.S. 128, 138 (1978)).

**D.    Excessive Use Of Force**

The United States Supreme Court has held that excessive use of force claims pursuant to the Fourth Amendment should be analyzed under an "objective reasonableness" standard. *Graham v. Connor*, 490 U.S. 386, 388 (1989).[7]  The Fourth Circuit has held that, in "considering the reasonableness of an officer's actions, [the Court] must consider the facts at the moment that the challenged force was employed." *Smith v. Ray*, 781 F.3d 95, 101 (4th Cir. 2015) (citation omitted).  And so, the Court must judge an officer defendant's use of force "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396.

---

[7] The Plaintiff's Maryland Declaration of Rights and battery claims are analyzed using the same standards as his excessive use of force claim.  *See Hines v. French*, 852 A.2d 1047, 1069 (Md. Ct. Spec. App. 2004) ("The standards for analyzing claims of excessive force are the same under Articles 24 and 26 of the Maryland Constitution as that under the Fourth Amendment of the United States Constitution.") (citation omitted); *see also Randall v. Peaco*, 927 A.2d 83, 89 (Md. Ct. Spec. App. 2007) (explaining that claims pursuant to Maryland Declaration of Rights Articles 24 and 26 are "assessed under Fourth Amendment jurisprudence, rather than notions of substantive due process, precisely like the analysis employed for claims brought under 42 U.S.C. § 1983.") (citations omitted); *Richardson v. McGriff*, 762 A.2d 48, 56 (Md. 2000) (explaining that claims under Article 26 of the Maryland Declaration of Rights and common law battery claims are governed by the standards applied to excessive use of force claims under federal law).

The Supreme Court has also held that determining whether a defendant officer used an excessive level of force requires "a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Id.* (citation and internal quotation marks omitted). Specifically, this Court should consider the following three factors in assessing an excessive use of force claim: (1) "the severity of the crime at issue," (2) "whether the suspect poses an immediate threat to the safety of the officers or others," and (3) "whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight." *Id.* (citation omitted). The Supreme Court has cautioned, however, that the Court should not "apply this standard mechanically," because there could be other "types of objective circumstances potentially relevant to a determination of excessive force." *Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015). Given this, the Court must analyze whether "the totality of the circumstances" justified the level of force used in assessing an excessive use of force claim. *Smith*, 781 F.3d at 101 (citing *Tennessee v. Garner*, 471 U.S. 1, 8-9 (1985)).

In this regard, courts have "long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion . . . to effect it." *Graham v. Connor,* 490 U.S. 386, 396 (1989). And so, the Fourth Circuit has held that "[a]n efficient, lawful arrest of a resisting suspect that causes the suspect to suffer only de minimis injuries does not constitute excessive force." *Pegg v. Herrnberger*, 845 F.3d 112, 120 (4th Cir. 2017).

### E.    Qualified Immunity

Lastly, the Supreme Court has explained that the "doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). And so, it is well-established that "[t]he doctrine of qualified immunity protects police officers and public officials from claims of constitutional violations 'for reasonable mistakes as to the legality of their actions.'" *Merchant v. Bauer*, 677 F.3d 656, 661 (4th Cir. 2012) (citation omitted). In this regard, the Fourth Circuit has held that the Court should apply a two-step test when determining whether a defendant is entitled to qualified immunity. *See Wilson v. Prince George's Cnty., Md.*, 893 F.3d 213, 219 (4th Cir. 2018); *see also Pearson*, 555 U.S. at 232. First, the Court inquires whether "the facts alleged or shown,

taken in the light most favorable to the plaintiff, establish that the [defendant's] conduct violated the plaintiff's constitutional right." *Wilson*, 893 F.3d at 219 (citation omitted). Second, the Court must determine whether "the right at issue was 'clearly established' at the time of [defendant's] conduct." *Id.* (citation omitted). In this regard, courts have recognized that "[w]here the authorizing officer has made a factual mistake but the mistake is not apparent, immunity for the officer who reasonably assisted is well settled." *Liu v. Phillips*, 234 F.3d 55, 57 (1st Cir. 2000) (citing *United States v. Hensley*, 469 U.S. 221, 232 (1985); *see also Rose v. Centra Health, Inc.*, No. 6:17-CV-00012, 2017 WL 3392494, at *4 (W.D. Va. Aug. 7, 2017).

### F.    Doe Defendants And Official Capacity Suits

Lastly, the Fourth Circuit has held that "[t]he designation of a John Doe defendant is generally not favored in the federal courts; it is appropriate only when the identity of the alleged defendant is not known at the time the complaint is filed and the plaintiff is likely to be able to identify the defendant after further discovery." *Chidi Njoku v. Unknown Special Unit Staff*, 217 F.3d 840 (4th Cir. 2000); *see also Schiff v. Kennedy*, 691 F.2d 196, 198 (1982) ("[I]f it does not appear that the true identity of an unnamed party can be discovered through discovery or through intervention by the court, the court could dismiss the action without prejudice."). The Supreme Court has held that "[a]n official capacity suit is, in all respects other than name, to be treated as a suit against the [governmental] entity…. It is *not* a suit against the official personally, for the real party in interest is the entity." *See Kentucky v. Graham*, 473 U.S. 159, 166, 105 S. Ct. 3099, 3105 (1985); *see also Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 690, n.55 (1978) (official capacity suits "generally represent only another way of pleading an action against an entity of which an officer is an agent"); *Jenkins v. Kurtinitis*, 2015 WL 1285355, at *35 (D. Md. Mar. 20, 2015) ( dismissing claims against community college employees, as "these are in effect claims against CCBC [the community college] itself [and] any claims against other defendants in their official capacities are merely duplicative…").

## IV.    LEGAL ANALYSIS

The Defendants have moved for summary judgment on the Plaintiff's remaining claims in this civil action, pursuant to Fed. R. Civ. P. 56, upon several grounds. First, the Defendants argue that the Court should enter summary judgment in their favor on the Plaintiff's Fourth Amendment/Section 1983 claim in Count IV of the amended complaint, with regards to the entry

into the Residence and seizure of the Plaintiff, because the undisputed material facts show that: (a) the Defendant Officers had reasonable articulable suspicion to conduct an investigatory stop before the Plaintiff retreated into the Residence; (b) the Defendant Officers' warrantless entry into the Residence was justified to render emergency assistance and check on the welfare of the children; and (c) even if the entry into the Residence was unjustified, the Defendant Officers are entitled to qualified immunity. ECF No. 78-1 at 17-23. Second, the Defendants argue that the Court should enter summary judgment in their favor on the Plaintiff's Fourth Amendment/Section 1983 claim in Count IV of the amended complaint, with regards to their use of force, because the undisputed material facts show that: (a) the use of force was objectively reasonable and not excessive; and (b) even if the use of force was unreasonable, the Defendant Officers are entitled to qualified immunity.

Third, the Defendants argue that the Court should enter summary judgment in their favor on the Plaintiff's Maryland Declaration of Rights claims in Count V of the amended complaint, because the undisputed material facts show that the Defendant Officer's entry into the Residence, seizure of the Plaintiff and use of force were reasonable. Fourth, the Defendants argue that the Court should also enter summary judgment in their favor on the Plaintiff's claims against the Doe Defendants, because such claims are not favored in federal courts. *Id*. at 30-31. Fifth, the Defendants argue that the Court should enter summary judgment in their favor on the Plaintiff's claims for punitive damages, because there is no evidence to show that the Defendants acted with evil motive or intent, or with reckless indifference to the Plaintiff's constitutional rights. *Id*. at 31-32.

Sixth, the Defendants argue that the Court should enter summary judgment in their favor on the Plaintiff's official capacity claim against Chief Jones, because this claim is essentially a claim against the County and, thus, duplicative. *Id*. at 33-35. Lastly, the Defendants argue that the Court should enter summary judgment in their favor on the Plaintiff's *Monell* and Maryland Declaration of Rights claims against the County in Counts IV and V of the amended complaint, because these claims fail as a matter of law as to the Defendant Officers. *Id*. at 36. And so, the Defendants request that the Court grant their motion for summary judgment and dismiss this matter. *Id*. at 36.

The Plaintiff counters in his response in opposition that the Court should not enter summary judgment in favor of the Defendants on his claims, because: (1) the Defendants' legal

theory in this case has been refuted by this Court; (2) there was no reasonable articulable suspicion to conduct a *Terry* stop; (3) there was no seizure of the Plaintiff before the Defendant Officers entered the Residence; (4) there was no exigency to justify the Defendant Officers entering into the Residence; (5) the use of force was unjustified, given the lack of a justification for arrest; (6) all rights were clearly established in 2017; (7) the Plaintiff's *Monell* claims survive even if the Defendant Officers are entitled to qualified immunity; and (8) the state of mind of Sergeant Diaz and Officer Min renders punitive damages available. And so, the Plaintiff requests that the Court deny the Defendants' motion for summary judgment. *Id*. at 21.

For the reasons that follow, the undisputed material facts in this case show that the Defendant Officers had reasonable articulable suspicion to conduct an investigatory stop before the Plaintiff retreated into the Residence. The undisputed material facts also show that the Defendant Officers warrantless entry into the Residence was lawful and justified to check on the welfare of the children.

For these reasons, the Plaintiff also cannot prevail on his Maryland Declaration of Rights claims against all Defendants in Count V of the amended complaint. In addition, the undisputed material facts show that the Plaintiff's *Monell* claim against the County must fail, because the Defendant Officers' conduct was lawful. And so, the Court: (1) GRANTS the Defendants' motion for summary judgment and (2) DISMISSES this complaint.

### A.    The Defendants Are Entitled To Summary Judgment On The Plaintiff's Fourth Amendment-Based Section 1983 Claim

#### 1.  The Defendants' Entry Into The Residence Was Lawful

As an initial matter, the undisputed material facts show that the Defendant Officers did not violate the Plaintiff's Fourth Amendment rights by entering into the Residence to investigate a report of a kidnapping. Courts in this Circuit have recognized that the necessary elements to detain an individual pursuant to a *Terry* stop, where a suspect retreats into the home, are: (1) encountering a suspect outside a home; and (2) officers having reasonable articulable suspicion of criminal activity prior to detainment. *See Allotey*, 2022 WL 17105120, at *6; *Harbin*, 712 F. Supp. at 71-72; *see also Edwards*, 364 A.2d at 1214. In this case, it is undisputed that the Plaintiff's encounter with Sergeant Diaz began outside his Residence, during which Officer Diaz and the Plaintiff had a conversation for approximately one minute, before the Plaintiff

retreated into the Residence. ECF Nos. 78-7; 78-9. And so, there is no dispute in this case that the police encounter at issue began outside of the Plaintiff's home.

A careful review of the undisputed material facts in this case also shows that Sergeant Diaz had reasonable articulable suspicion that a crime was being committed, namely, kidnapping, before he entered the Residence. It is well-established that, to detain an individual pursuant to a *Terry* stop, an officer must have reasonable articulable suspicion of criminal activity. *Johnson*, 599 F.3d at 345. Reasonable suspicion is suspicion based on "specific and articulable facts . . . taken together with rational inferences from those facts[.]" *Terry*, 392 U.S. at 21. This is an objective standard that examines the reasonableness of police action based on the facts available to the officer at the time of the seizure. *Id.* at 21-22. Given this, "the level of suspicion required for a *Terry* stop is obviously less demanding than that for probable cause[.]" *Id.*

In this case, the unrebutted evidence shows that the Sergeant Diaz, and the other Defendant Officers who joined him on the scene, had reasonable articulable suspicion that the crime of child kidnapping had been committed to support a *Terry* stop of the Plaintiff for several reasons. First, the undisputed material facts show that Sergeant Diaz was aware of a report of kidnapping involving the Plaintiff's vehicle. In this regard, it is undisputed that, on October 22, 2017, at 8:09 p.m., the ECC issued a priority call over the radio to MCPD Officers for the kidnapping of children outside of an IHOP located in Silver Spring, Maryland. ECF No. 78-3; ECF No. 78-4. The ECC dispatcher advised the MCPD Officers to "respond priority for a kidnapping" in the area of Piney Branch Road and University Blvd and advised that the "complainant was told by another driver that he saw someone grab three children and put them in the trunk of a vehicle." ECF No. 78-3 at 00:00:18-28; 00:00:29-36. The ECC also provided the following description: "A suspect vehicle, black, [license plate number], driven by a black male, northbound university towards Wheaton, unknown location in route." *Id.* at 00:01:19-32.

It is also undisputed that the information regarding the alleged kidnapping was provided to 911 by a second party caller who identified himself as "Luis," and said that he was relaying information from the original complainant, who was later identified as Edgar Ayala Solano. ECF No. 78-3 at 1; ECF No. 78-4. Shortly after the initiation of the 911 call, Officer Moran advised that he had made in-person contact with the original complainant, Mr. Ayala Solano:

Edgar original complainant here. He says that he was at the IHOP in

> Langley Park, that he saw the black male open the trunk, yell at the kids,
> and close the trunk, but like I said, they might have possible rear-facing
> seats in the trunk that are legal.

ECF No. 78-3 at 00:04:28-50. And so, the undisputed material facts show that Mr. Ayala Solano
provided an accurate description of the vehicle and tag number involved in the alleged
kidnapping and he reported the vehicle was being driven by a black male. *See also* ECF No. 78-8
at ¶ 11.

There is also no dispute in this case that Sergeant Diaz was aware of the reported
kidnapping and that Officer Moran had spoken to Mr. Ayala Solano and confirmed the report of
an alleged child kidnapping before he arrived at the Residence. ECF No. 78-3 at 00:04:28-50.
The undisputed evidence also shows that a license plate check came back to a registered Tesla
with an associated address of 1 Eastmoor Drive, which is the Plaintiff's address, and a limited
description of the associated owner as a black male. ECF No. 78-3.

The undisputed material facts also show that Sergeant Diaz's reasonable suspicion of
criminal activity was further heightened once he arrived at the Residence, because of the conduct
of the Plaintiff. In this regard, the undisputed material acts also show that the Plaintiff, who is a
black male, matched the limited description provided by Mr. Ayala Solano. ECF No. 78-7 at ¶
11. The undisputed material facts show that the Plaintiff and Mrs. Hayat were already standing
on the front step of the Residence when Sergeant Diaz arrived at the residence without using his
police cruiser lights and sirens. *Id*. at ¶¶ 9-11. Sergeant Diaz states in his sworn Affidavit that he
believed that the Plaintiff and Mrs. Hayat had anticipated the arrival of police and that he found
their conduct suspicious, because it suggested that they may have knowledge of the reported
kidnapping. ECF No. 78-7 at ¶¶ 12-13.

Sergeant Diaz also states in his sworn Affidavit that, when he notified the Plaintiff that he
was investigating a reported kidnapping outside of the IHOP in Langley Park and asked the
Plaintiff whether he had been at the IHOP, the Plaintiff did not appear surprised, and he did not
acknowledge whether or not he had been at the IHOP. *Id*. at ¶ 17. In addition, Sergeant Diaz
found that the Plaintiff evaded his questions and appeared defensive. *Id*. Sergeant Diaz's
observations regarding the Plaintiff's conduct are corroborated by the body-worn camera footage
of his initial encounter with the Plaintiff. ECF No. 78-3.

This video evidence also shows that the Plaintiff confirmed that there were children
located inside of the Residence, but he refused to allow Sergeant Diaz to see the children or to

enter the home to check on their welfare.  *Id*.  The body-worn camera footage also makes clear
that Mrs. Hayat began to engage in a dialogue with Sergeant Diaz regarding the reported
kidnapping, but the Plaintiff promptly cut off this discussion and directed her to go inside the
Residence.  *Id*.  Sergeant Diaz states in his sworn Affidavit that it appeared to him that the
Plaintiff was attempting to prevent an exchange of information that may be relevant to the
kidnapping investigation, thereby adding to his suspicion that a kidnapping had been committed
and that the Plaintiff was involved.  ECF No. 78-7 at ¶¶ 19-20.  Given this, Sergeant Diaz
represents to the Court that, based upon his experience, knowledge, and training in recognizing
signs of deception, he reasonably believed that the Plaintiff was showing signs of deception
regarding the alleged kidnapping.  The Defendants convincingly argue that these undisputed
material facts show that Sergeant Diaz had reasonable articulable suspicion that a kidnapping
had been committed by the Plaintiff, to support a *Terry* stop before he entered the Residence.

　　　The Plaintiff's arguments to show that there was no reasonable articulable suspicion
that a kidnapping had been committed are also unpersuasive.  The Plaintiff first argues that
Sergeant Diaz lacked reasonable articulable suspicion, because the report of a kidnapping
was made by an anonymous caller.  ECF No. 84 at 12.  But, as discussed above, the
undisputed material facts show that Officer Moran had relayed over the radio that he had
spoken to the original complainant directly and confirmed the kidnapping report and
description of the vehicle and suspect, by the time Sergeant Diaz encountered the Plaintiff.
*See* ECF No. 78-3 at 00:00:20, 00:04:28.  The Plaintiff's argument that there could be no
reasonable articulable suspicion, because the Defendant Officers were aware that Tesla cars
have rear-facing seats, is also unavailing.  While this fact could have explained why the
eyewitness believed that the children were placed in trunk, it does not negate Sergeant
Diaz's reasonable suspicion based upon the conduct of the Plaintiff once he arrived at the
Residence.  The limited description of the Plaintiff provided by Mr. Ayala Solano is
similarly insufficient to show that Officer Diaz lacked reasonable suspicion, because any
minor discrepancies between the suspect's reported characteristics and those of the Plaintiff
are not sufficient to find a constitutional violation.  And so, the Court is satisfied that the
totality of evidence, when viewed through the lens of Sergeant Diaz's knowledge, training and
experience, provided Sergeant Diaz with reasonable articulable suspicion that the crime of
kidnapping was being committed before he entered the Plaintiff's Residence.

The Court is also satisfied that undisputed material facts also show that Sergeant Diaz and the other Defendant Officers on the scene lawfully entered the Residence, after having reasonable articulable suspicion of a kidnapping, once the Plaintiff retreated into the Residence. The Fourth Circuit has recognized that a suspect's retreat into their home cannot thwart a *Terry* stop, if the officers had reasonable suspicion of criminal activity prior to the retreat. *Rivera*, 57 Fed. App'x at 562 (collecting cases). As discussed above, the unrebutted evidence shows that Sergeant Diaz had reasonable articulable suspicion of the crime of kidnapping, before the Plaintiff retreated into the Residence, based upon the 911 report of an alleged child kidnapping, the fact that the reported vehicle was registered to the Plaintiff's address, and the Plaintiff's behavior towards Sergeant Diaz. Given these facts, the unrebutted evidence shows that the Defendant Officers were justified in following the Plaintiff into the Residence to continue investigating the suspected kidnapping. And so, the Court concludes that the Defendant Officers' entry into the Residence to continue the *Terry* stop was constitutionally permissible under the Fourth Amendment.

For this reason, the Court GRANTS the Defendants' motion for summary judgment on the Plaintiff's Fourth Amendment-based Section 1983 claim with regards to their entry into the Residence.[8] Fed. R. Civ. P. 56.

## 2.    The Defendants' Use Of Force Was Reasonable

Turning to the Defendant Officers' use of force once inside the Residence, the undisputed material facts in this case also show that the Defendant Officers employed reasonable force on the Plaintiff. The Court analyzes the Plaintiff's excessive use of force claims pursuant to the Fourth Amendment under an "objective reasonableness" standard. *Graham*, 490 U.S. at 388. In this regard, the Fourth Circuit has held that, in "considering the reasonableness of an officer's actions, [the Court] must consider the facts at the moment that

---

[8] Because the Court concludes that the Defendant Officer's entry into the Residence was lawful, the Court need not reach the issue of qualified immunity. The Court also observes that the Defendants also persuasively argue that they are entitled to summary judgment on the Plaintiff's claims against the unnamed and unidentified John Doe Defendants at this advance stage in this litigation. *Chidi Njoku v. Unknown Special Unit Staff*, 217 F.3d 840 (4th Cir. 2000) ("The designation of a John Doe defendant is generally not favored in the federal courts; it is appropriate only when the identity of the alleged defendant is not known at the time the complaint is filed and the plaintiff is likely to be able to identify the defendant after further discovery.").

the challenged force was employed." *Smith*, 781 F.3d at 101 (citation omitted). And so, the Court must judge an officer defendant's use of force "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396.

To do so, the Court considers the following three factors in assessing an excessive use of force claim: (1) "the severity of the crime at issue," (2) "whether the suspect poses an immediate threat to the safety of the officers or others," and (3) "whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight." *Id.* (citation omitted). The Supreme Court has cautioned, however, that the Court should not "apply this standard mechanically," because there could be other "types of objective circumstances potentially relevant to a determination of excessive force." *Kingsley*, 576 U.S. at 397. And so, the Court must analyze whether "the totality of the circumstances" justified the level of force used in assessing an excessive use of force claim. *Smith*, 781 F.3d at 101 (citing *Tennessee v. Garner*, 471 U.S. 1, 8-9 (1985)).

In this case, the unrebutted evidence, when viewed in the light most favorable to the Plaintiff, shows that the use of force employed by the Defendant Officers was objectively reasonable under the circumstances presented.[9] First, the body-worn camera evidence and the undisputed material facts make clear that, before the Defendant Officers entered the Residence, the Plaintiff attempted to physically shut the door of the Residence to impede the Defendant Officers from continuing their investigation into the report of a kidnapping of children. ECF No. 78-3. Immediately after this occurred, Sergeant Diaz and Officer Min proceeded to open the door and to enter the Residence. *Id.* The Plaintiff was highly agitated and began yelling when Sergeant Diaz and Officer Min entered the foyer of the Residence. *See* ECF No. 78-9 at 00:01:41-00:01:47. Furthermore, the Plaintiff refused to comply with commands and resisted the Defendant Officers' efforts to handcuff him. *See* ECF No. 78-12 at 77:1-2 and 78:13-79:4; ECF No. 78-11.

In response to this conduct, the Defendant Officers determined that they needed to handcuff the Plaintiff, because his conduct and behavior created a safety concern for them

---

[9] There is no dispute that Officer Dolan did not use force or have any physical contact with the Plaintiff. ECF No. 78-15 (Defs. Ex. 5, Affidavit of Officer Brooke Dolan Kyriacou) at ¶ 8); *see generally* ECF No. 84. And so, the Plaintiff cannot prevail on his excessive is use of force claim with regards to Officer Dolan.

and others in the Residence, and that the Plaintiff's conduct also impeded their ability to check the welfare of the children. ECF No. 78-11 at 00:00:00 – 00:00:20. And so, the Defendant Officers employed force to handcuff the Plaintiff.

In this regard, the undisputed evidence shows that Officer Lenhart assisted Sergeant Diaz and Officer Min with taking the Plaintiff to the ground. ECF No. 78-14 at ¶¶ 10-12. The evidence also shows that, once the Plaintiff was handcuffed, the Defendant Officers assisted him in getting to a seated position and had him sit on a bench. ECF No. 78-16 at 00:02:39. Notably, it is undisputed that the Defendant Officers hid not employ strikes, punches, kicks, hits, or weapons against the Plaintiff. ECF Nos. 78-7; 78-10, 78-14, 78-15 and 84. It is also undisputed that the Plaintiff experienced a blood lip as a result of this encounter and that he declined to be taken to a hospital at the scene. ECF No. 78-17 00:21:27.

Importantly, the undisputed material facts make clear that, once the Plaintiff was subdued and no longer in a position to impede the Defendant Officers' investigation, no further force was employed by the Defendant Officers and the Plaintiff was unhandcuffed. ECF No. 78-17 at 1:30:00-00:09:37. Given these undisputed facts, the totality of the circumstances surrounding the use of force in this case show that the Defendant Officers employed reasonable force against the Plaintiff to ensure the safety of the Defendant Officers and others in the Residence, and to allow the Defendant Officers to complete the investigation into the alleged kidnapping. *Pegg*, 845 F.3d at 120 ("An efficient, lawful arrest of a resisting suspect that causes the suspect to suffer only de minimis injuries does not constitute excessive force.").[10] And so, the Court also GRANTS the Defendant's motion for summary judgment on the Plaintiff's of excessive use of force claim in Count V of the complaint. Fed. R. Civ. P. 56.

### B.    The Defendants Are Entitled To Summary Judgment On The Plaintiff's Maryland Declaration Of Rights Claims

Because the Court concludes that the Defendant Officers' entry into the Residence

---

[10] The Plaintiff's argument that the use of force was excessive, because the Defendant Officers lacked reasonable articulable suspicion to enter the Residence Plaintiff, is also not persuasive. ECF No. 88-1 at 24. As discussed above, the undisputed material facts in this case show that Sergeant Diaz has reasonable articulable suspicion that crime of kidnapping being committee before he entered the Residence.

and use of force comport with the Fourth Amendment, the Court must also GRANT the Defendants' motion for summary judgment with regards to the Plaintiff's claims under the Maryland Declaration of Rights. *Williams*, 112 Md. App. at 547 (In analyzing claims brought under Articles 24 and 26 of the Maryland Constitution, the Court applies the same analysis that it uses for claims brought under the Fourth Amendment.). And so, the Court GRANTS the Defendants' motion for summary judgment on Count V of the complaint as to Sergeant Diaz, Officer Min, Officer Dolan and Officer Lenhart.

C.    **The Plaintiff Cannot Prevail On His *Monell* Claims Against The County**

For similar reasons, the Court must also GRANT the Defendants' motion for summary judgment with regards to the Plaintiff's *Monell* claims against the County in Counts IV and V of the complaint. To prove his *Monell* claims against the County, the Plaintiff must first show that the Defendant Officers' conduct violated his Fourth Amendment rights. *Tserkis*, 2019 WL 4932596, at *4. As discussed above, the undisputed material facts in this case make clear that the Plaintiff cannot make such a showing here. And so, the County is also entitled to summary judgment in its favor on the Plaintiff's *Monell* claims in Count IV and V of the complaint.[11]

V.    **CONCLUSION**

In sum, the undisputed material facts in this case show that the Defendant Officers had reasonable articulable suspicion to conduct an investigatory stop before the Plaintiff retreated to the Residence. The undisputed material facts also show that the Defendant Officers warrantless entry into the Residence after the Plaintiff retreated was lawful. Given this, the undisputed material facts show that the Plaintiff cannot prevail on his remaining claims in this case. The Court observes as a final matter that the facts reading the Plaintiff's encounter with the Defendant Officers in this case are somewhat troubling, given that it was ultimately determined that the Plaintiff was a parent of the children in the Residence and that the children were

---

[11] The Court also agrees with the Defendants that the Plaintiff's claim against Chief Jones in this case is an official capacity suit and, thus, essentially a claim against the County. *See Kentucky v. Graham*, 473 U.S. 159, 166 (1985) ("[a]n official capacity suit is, in all respects other than name, to be treated as a suit against the [governmental] entity….It is *not* a suit against the official personally, for the real party in interest is the entity.").

unharmed.  But such 20/20 hindsight is not the proper lens for the Court to use when analyzing the Plaintiff's Fourth amendment claims.

And so, for the forgoing reasons, the Court:

1. **GRANTS** the Defendants' motion for summary judgment; and

2. **DISMISSES** this complaint.

A separate Order shall issue.

**IT IS SO ORDERED.**

s/Lydia Kay Griggsby
LYDIA KAY GRIGGSBY
United States District Judge